**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 06-cv-02358-CMA-KLM

RAYMOND BONANNO, et al.,

      Plaintiffs,

v.

THE QUIZNOS FRANCHISE COMPANY LLC, et al.,

      Defendants.

---

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

---

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................. 1

II.   STATEMENT OF FACTS .............................................................. 3

    A.   The History of Quiznos ........................................................... 3

    B.   The Development of the Quiznos Franchise System ............... 4

        1.   The Sales Process ......................................................... 5

        2.   UFOC Disclosures ......................................................... 7

        3.   Key Terms of the Franchise Agreement ......................... 9

    C.   The Named Plaintiffs ............................................................ 11

    D.   Quiznos' SNO Management Program .................................... 15

    E.   Prior Individual Claims and Lawsuits .................................... 18

    F.   Procedural History of this Case ............................................ 19

    G.   CURRENT STATUS OF SNOS .............................................. 20

III.  ARGUMENT ................................................................................ 20

    A.   A Class Cannot Be Certified Because All Named Plaintiffs And Members Of The Putative Class Waived Their Right To Have These Claims Adjudicated As A Class Action ......................... 22

        1.   Class action waivers are enforceable and should be enforced ...................................................................... 22

        2.   The class action waiver provision is not unconscionable ............ 25

    B.   Plaintiffs Fail To Satisfy The "Rigorous Analysis" Necessary To Support Certification Under Rule 23 ...................................... 33

        1.   PLAINTIFFS CANNOT SATISFY THE PREDOMINANCE REQUIREMENT UNDER RULE 23(b)(3) ...................................... 34

            a.   CCPA and Fraud ............................................... 35

            b.   Breach of Contract and the Covenant of Good Faith and Fair Dealing ............................................... 40

            c.   Equitable Claims ............................................... 44

            d.   State Law Considerations .................................. 47

# TABLE OF CONTENTS
## (continued)

Page

2.  The representative plaintiffs and the counsel they have selected cannot "fairly and adequately protect the interests of the class" .................................................................................. 49

    a.  The Interests of named Plaintiffs are in conflict with other class members ......................................................... 50

    b.  Counsel for Plaintiffs have previously represented individual SNOs and that representation puts them in conflict with members of the putative classes .................. 53

3.  Class Action is not superior to other available methods to fairly and efficiently adjudicate these claims ............................... 55

    a.  The Possibility of Substantial Individual Recovery Means Class Action Is Not Superior to Individual Action .............................................................................. 56

    b.  Class treatment is not superior because this case is unmanageable as a class action ....................................... 59

4.  PLAINTIFFS FAIL TO MEET THE TYPICALITY REQUIREMENTS OF RULE 23(a)(3) ........................................ 62

5.  NO INJUNCTION CLASS SHOULD BE CERTIFIED UNDER Fed. R. Civ. P. 23(b)(2) ............................................................. 65

IV.  CONCLUSION ............................................................................... 66

# I.    INTRODUCTION

The Court should reject Plaintiffs' request to represent three distinct classes of Quiznos' franchisees comprising different categories of individuals who signed a Quiznos franchise agreement but failed to live up to their contractual obligation to secure an appropriate site and open a store.  As a threshold matter, the named Plaintiffs and all putative members of the classes they seek represent agreed to *waive* their ability to invoke the class action procedure to adjudicate these claims.  This waiver is enforceable and certification should be denied.

Even if each Plaintiff and every member of the purported classes they want to represent had not waived their right to pursue a class action, Plaintiffs have failed to satisfy the "rigorous analysis" required by Federal Rule of Civil Procedure 23 to support certification of a class.  Plaintiffs have not even come close to meeting their burdens.  First, proof of individual issues predominate over any common question as to *each* of the seven causes of action Plaintiffs seek to pursue should this case be tried as a class action.  Plaintiffs' Colorado Consumer Protection Act ("CCPA"), fraud, contract and equitable claims, and Quiznos' defenses to them, are by their very nature premised on alleged statements, oral or implied contract provisions, actions and other factors that are *specific* and *unique* to each named plaintiff and each member of the putative classes they seek to represent.  Plaintiffs' conclusory statements come far short of meeting the required showing of how they would establish each element of each claim with proof that is common to the class—nor can they do so.  Because proof of individual

issues will clearly predominate should this case be tried as a class action, certification must be denied.

Second, the sixteen named Plaintiffs and the counsel who represent them will not adequately protect their interests or the interests of the classes because of conflicts among the Plaintiffs and members of the classes and between their counsel and members of the classes.  Plaintiffs seek to certify three classes of Quiznos franchisees who have not opened a store:  Class 1, those whose franchise agreements were terminated after failing to open a store within 12 months (many of whom signed a release as to all claims against Quiznos); Class 2, those who were not terminated and remain a Quiznos franchisee (many of whom signed a release as to all claims against Quiznos); and Class 3, those members of Class 2 who will at some point in the future opt-out *assuming* Class 2 is certified.  There exist conflicts of interest between current and former Quiznos franchisees that comprise Classes 1 and 2 so that none of the named plaintiffs can adequately represent either class; nor, assuming the named plaintiffs *opt-in*, can any of them represent a group of franchisees who *opt out*.  Further conflicts exist between named Plaintiffs and the counsel who seek to represent them.

Third, the class action procedural mechanism is *not* the superior method to fairly and efficiently adjudicate *these* claims.  Indeed, a number of Quiznos franchisees like Plaintiffs have pursued similar claims in individual actions—some of them represented by Plaintiffs' counsel now seeking certification to represent one or more classes—and which have been successfully resolved.  Indeed, Plaintiffs identify no cases finding that $20,000 to $25,000 in damages—let alone claims with potential trebling and attorneys

fees—are small enough to justify class action treatment.  And, as Plaintiffs' counsel concede, individualized issues such as damages and reliance would require many mini-trials even if a portion of the claims were certified, making this matter unmanageable as a class action.

Fourth, Plaintiffs' claims are not typical of the class of franchisees that they seek to represent.

Fifth, Plaintiffs' request to additionally certify a Rule 23(b)(2) injunction class defined to include franchisees who *opt-out* of the primary class, assuming one is even certified, must be denied as no named plaintiff is adequate to represent such a class. For any or all of these reasons, Plaintiffs' motion for class certification should be denied.

## II.    STATEMENT OF FACTS

### A.    THE HISTORY OF QUIZNOS

Quiznos is a Denver-based nationwide franchisor of Quiznos Sub Restaurants and today is famous around the world for its toasted sub sandwiches, soups and salads. Quiznos began in 1981 with a single restaurant at 13th and Grant in Denver's Capitol Hill neighborhood.  Six years later, defendant Richard E. Schaden purchased his first Quiznos franchise in Boulder, Colorado.  (App. 000915, R.E. Schaden Tr. 29:11-14, March 8, 2008.)  He believed in the Quiznos brand and concept and purchased two additional franchises over the next few years.  (*Id.* at 000915-916, Tr. at 29:23-30:12.)

In 1991, he and his father, defendant Richard F. Schaden, bought the entire Quiznos franchise operation which, at the time, consisted of 18 restaurants.  (*Id.* at 917, Tr. at 31:1-4.)  Rick Schaden was an experienced franchisee when he and his father

purchased Quiznos in 1991 and personally understood what it took to operate a franchise that was successful for both the franchisor and the franchisee.  Convinced there was a broader market for the Quiznos' products and brand, he developed the infrastructure necessary to sustain future growth and began to sell franchises in select markets nationwide.  (*Id.*)

In the five years that followed the purchase of the company, Rick Schaden and others successfully grew the Quiznos chain to 100 restaurants nationwide.  That success has continued to the present.  By the end of 2000, there were over 1,100 Quiznos restaurants open, and today, there are over 4,400 Quiznos restaurants nationwide and approximately 600 additional stores in 23 foreign countries.  (C. Bryan Decl. at 1, ¶6.)

## B.    THE DEVELOPMENT OF THE QUIZNOS FRANCHISE SYSTEM

Quiznos has every incentive to ensure that its franchisees open stores.  Indeed, Quiznos' continued and future success is predicated on a long-term, predictable revenue stream that is generated *only* from open stores—*not* franchise fees collected from franchisees who never open stores.[1]  (Declaration of Andrew Pillari ("A. Pillari Decl.") at 1, ¶3 (noting that income from open franchises is approximately 15 times greater than the income associated with the initial franchise fee).)  Quiznos usually charges an initial fee to all its franchisees of $20,000 to $25,000 for a traditional store in exchange for the license to use the Quiznos marks and methods, and the average

---

[1] *Once a store is opened*, Quiznos receives royalty payments of 7% of average weekly gross sales plus a contribution to weekly national and regional advertising funds which pay for advertising. (*See* App. 000008, 18-19, Franchise Agreement §§ 5.1, 12.3, 12.4.)

amount collected for all stores is approximately $17,000.  (A. Pillari Decl. at 2, ¶¶ 4-5.)
However, Quiznos does not recognize this payment as income until the store opens.
(*Id.* at 2, ¶4)  Moreover, the $20,000-25,000 initial franchise fee is less than the costs
Quiznos incurs.  (*Id.* at 2, ¶5.)  That is, Quiznos' expenses incurred in selling franchises,
assisting franchisees in opening new stores and reviewing applications and proposed
architectural plans for new franchised locations has always exceeded the initial
franchise fee.  (*Id.*)  Plaintiffs entire theory is counter intuitive, counter common sense,
counter reality, and counter their own counsel's theory in other cases filed against
Quiznos.[2]

### 1.    The Sales Process

Quiznos advertises to prospective franchisees (who it hopes will ultimately sign a
franchise agreement *and* open a store) through a number of channels including its
website, print media, radio and television advertising, and live sales seminars.  (App.
930, J. Teza Tr. 68:10-25, Jan. 15, 2008.)  It relies on a blend of in-house sales-people
and independent contractors known as area directors to develop markets nationwide
and to interact directly with prospective and actual franchisees.[3]  (*Id.* at 31:16-32:7.)

---

[2] Ironically, the so-called operator class-action cases, also filed by Plaintiffs' counsel, are predicated on a contradictory theory—that Quiznos will do anything to get stores open so it can charge excessive fees for supplies and equipment it sells to franchisees.  *See Siemer v. Quizno's Franchise Co.*, No. 07-2170, 2008 WL 904874, *1-2 (N.D. Ill. Mar 31, 2008); *Westerfield v. Quizno's Franchise Co.*, 527 F. Supp. 2d 840, 846 (E.D. Wis. 2007), vacated in part by *Westerfield v. Quizno's Franchise Co.*, No. 06-1210, 2008 WL 2512467, *11 (E.D. Wis. April 16, 2008).  *See also* Amended Class Action Complaint and Jury Demand ("Am. Compl."), filed August 1, 2007, Dckt. No. 89, at 8, ¶ 25.

[3] Area directors and in-house sales agents are personally incentivized to ensure that the franchises they sell result in opened stores.  Area directors generally receive half of their portion of the initial franchise fee and 40% of the ongoing royalties only once a store is opened.  Bonus compensation for Quiznos in-house sales agents is similarly linked to the number of leases signed and stores opened, *not* only on the number of franchises sold.  (*See* Crittenden Decl. at 2, ¶ 5, August 5, 2008 (noting that

Quiznos has developed marketing materials available to prospects and to be used by its sales agents and area directors in connection with the solicitation of prospective franchises.  (App. 000920-21, Steve Schaffer Dep. Tr. at 286:5-287:8, March 11, 2008.)  Such materials have been developed by Quiznos with great care to ensure that they provide accurate information about what is required to become a Quiznos franchisee, and are consistent with the disclosures set forth in the Uniform Franchise Offering Circular ("UFOC") (now known as a "Uniform Franchise Disclosure Document" or "UFDD") provided to each franchisee and the terms of Quiznos standard franchise agreement.[4]  (App. 000404-05, Plaintiff Disclosure Chart.)

Prospects come to Quiznos in various ways, as shown through the varied experiences of the named Plaintiffs.  (App. 000396-397, 400-403.)[5]  Some viewed web-based or mailed advertising to varying degrees, some attended sales seminars, some had one-on-one meetings with a Quiznos' representative, or a combination of these processes.  (*Id.*)  All signed a receipt acknowledging they received a disclosure document required by the FTC, which included a copy of the franchise agreement he or

---

sales agents were "aggressive" in placing franchisees in sites because sales agents' bonuses "were tied to store openings and lease signings") (attached as Exh. Q to Goode Declaration).)

[4] The sale of franchises is regulated by the Federal Trade Commission ("FTC").  *See United States v. Vaughn*, No. 01-20077, 2001 WL 1526274, at *1 & n.2 (D. Kan. Oct. 18, 2001) (describing FTC's regulation of the sale of franchising through its Rule on Franchising).  The FTC's Rule on Franchising sets forth disclosure requirements applicable to the sale of all franchises.  The FTC has approved guidelines to satisfy such requirements through the issuance of a UFOC or UFDD.  *See* 16 CFR § 436.1, *et seq.*; *Fed. Trade Commission v. Communidyne, Inc.*, No. 93-6043, 1994 WL 421472, at *1 (N.D. Ill. July 11, 1994) (describing FTC's approval of the form UFOC).  Quiznos prepares and distributes UFOCs and UFDDs in compliance with applicable standards.  (C. Bryan Decl. at 2, ¶5.)  As discussed below, eighteen states also have statutes that govern the franchisor-franchisee relationship, none of which has been invoked by Plaintiffs in this action.

[5] Citations to Plaintiffs' declarations refer to the declarations submitted by Plaintiffs as Exhibits to their brief in support of their motion for class certification ("Class Cert.").  (Motion Certify Class, doc. 212, filed Sept. 30, 2008; Brief in Support, doc. 241, filed Sept. 30, 2008.)

she signed, at least 10 business days before he or she signed the franchise agreement, although the degree to which each Plaintiff availed himself or herself of this disclosure document varied from not read at all, to "skimmed it," to read it thoroughly.  (App. 000404-405; s*ee also* App. 000924-925, J. Teza Tr. 76:9 – 77:1, Jun. 13, 2008 (prospects were given UFOCs at sales seminar after signing receipt or through the mail if they completed an application prior to attending the seminar)).

### 2. UFOC Disclosures

Quiznos' UFOCs include a number of important disclosures to all prospective franchisees.[6]  As relevant here, the UFOC makes clear that the initial franchise fee is non-refundable and fully earned when paid.  (App. 000073, UFOC Item 5 ("We fully earn the Initial Franchise Free when paid.  It is not refundable under any circumstances.")  The UFOC further states that it is the franchisee's obligation to identify and select a site for a store.  (*Id.* at 000097, Item 11 ("You must select the site for your Restaurant. . . . You will propose a location to us for approval") and 000074, Item 5 ("After you select a location for your Restaurant, we must approve that location."))  The UFOC also clearly provides a range of the average cost to open a store as incurred by franchisees in the prior fiscal year, including identifying the site, negotiating the lease, building out the space, and purchasing the necessary equipment and food products.

---

[6] For the sake of convenience, where the terms of the UFOC or agreement at issue are identical or substantially similar, Quiznos refers to the terms of the franchise agreement signed by Plaintiff A. Bonanno (included in Appendix in Support of Defendants' Brief in Opposition to Plaintiffs' Motion for Class Certification ("App.") at 000001 to 57) and the disclosures contained in the March 31, 2004 Uniform Franchise Offering Circular (App. 000052 to 386).  Where the terms of the franchise agreements or disclosures at issue are different, Quiznos identifies and cites to relevant portions of representative documents.

(*Id.* at 000053, 00081-84, Item 7; *see also* Defendants' Answer and Affirmative Defenses to the Amended Complaint ¶ 29.)

Since 2001, the UFOC has also specifically disclosed in the first few pages under the heading "Risk Factors" the number of current franchisees who had not opened their store in the required 12 months—expressed in both real numbers and as a percentage. For instance, Risk Factor No. 5 of the March 31, 2004 UFOC conspicuously advised potential franchisees in all capital and bold letters that:

> AS OF DECEMBER 31, 2003, 973 QUIZNO'S FRANCHISEES HAD NOT OPENED THEIR RESTAURANTS WITHIN 12 MONTHS OF SIGNING THE FRANCHISE AGREEMENT. THIS NUMBER REPRESENTS APPROXIMATELY 42% OF ALL FRANCHISEES WHO HAD NOT OPENED A RESTAURANT AS OF THAT DATE."

(App. 000054, UFOC Risk Factor No. 5)  UFOC Risk Factor No. 4 also advised potential franchisees that

> WE MAY TERMINATE YOUR FRANCHISE AGREEMENT IF YOU DO NOT OPEN YOUR RESTAURANT WITHIN 12 MONTHS AFTER YOU SIGN THE FRANCHISE AGREEMENT.  THE FRANCHISE FEE IS NONREFUNDABLE."

(App. 000054, Risk Factor No. 4.)  The UFOC also provided the name of all franchisees (with contact information) divided by those who had an open store and those who had not yet opened, by state.  (App. 000113-119, UFOC Item 20; App. 000172-277, UFOC, Ex. C); Goode Decl. at 6, ¶ 23, Sept. 30, 2008.)[7]  In addition, beginning with the March 31, 2004 UFOC, language was added to project the "typical" time to open a store at 8 to

---

[7] Incredibly, Plaintiffs' counsel repeats several times in their motion that none of the named Plaintiffs were told of the risk that they might not open their store in the required 12 months—even though each received these exact statistics and full lists in the UFOC.

12 months "if you secure a location within 6 to 8 months." (App. at 002405.) Beginning in the August 31, 2005 UFOC, the language was further modified to state that that the "typical" length of time to open a store was "12 to 24 months," and that Quiznos would not terminate a store for failing to open within 12 months, so long as the franchisee was actively and diligently seeking a suitable location or lease. (App. at 002659.)[8]

### 3.   Key Terms of the Franchise Agreement

All Quiznos franchisees sign a then-current standard form franchise agreement, which changes year-to-year. The named Plaintiffs all signed a franchise agreement at least ten business days after receiving a UFOC. Consistent with the disclosures in the UFOCs, all franchisees agreed that the initial franchise fee was non-refundable and fully earned when paid:

> 4.1 **Initial Franchise Fee**. Franchisee agrees to pay to Franchisor, concurrently with signing this Agreement, an initial franchise fee ("Initial Franchise Fee") in the amount set forth in Section 23.13. ***Franchisee acknowledges and agrees that the Initial Franchise Fee represents payment for the initial grant of the right to use the Marks and Licensed Methods, that Franchisor has earned the Initial Franchise Fee upon receipt, and that the Initial Franchise Fee is not refundable to Franchisee after it is paid***.

(App. 000008, Franchise Agreement § 4.1 (emphasis added).)

Each franchisee also agreed that he or she—*not* Quiznos—was contractually obligated to identify and select a site for the store, and that Quiznos' role was limited to

---

[8] As discussed below, eighteen states and two U.S. Territories also regulate the sale of franchises. Those states that regulate franchisor-franchisee relations also accept the NASAA disclosure form, but generally reserve the right to require additional disclosures. *See Kieland v. Rocky Mountain Chocolate Factory Inc.*, No.05-150, 2006 WL 2990336, at *9 (D. Minn. Oct. 18, 2006) (discussing Minn. Stat 2860.3800 (2004)).

providing site selection criteria and approving the site proposed by a franchisee. (App. 000007, Franchise Agreement § 3.1 ("[f]ranchisee shall choose and acquire a location for its Restaurant within the nonexclusive Target Area set forth in Exhibit 1"); App. 000014, Franchise Agreement § 9.1(a) ("Franchisee acknowledges that Franchisor has no obligation to select or acquire a site on behalf of Franchisee. . . . Site selection, acquisition, and development shall be the sole obligation of Franchisee []. . . Franchisee acknowledges that Franchisor is under no obligation to provide additional site selection services[.]")[9]

In addition, franchisees expressly disavow any reliance on any promises, assurances, or representations not contained within the franchise agreement itself. (App. 000041, Franchise Agreement § 23.2 ("Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor or its affiliates regarding projected sales volumes, market potential, revenues profits of Franchisee's Restaurant, or operational assistance other than as stated in this Agreement or in any disclosure document provided by Franchisor or its representatives.")[10] The franchise

---

[9] The fact that the franchisee (not Quiznos) finds the location for his or her restaurant has been adjudicated by several courts. These "express terms of the Franchise Agreements place the responsibility for site selection solely on the franchisee." *RHC, LLC v. Quiznos's Franchising*, No. 04-985, 2005 WL 1799536, at *6 (Colo. Dist. Ct. Jul. 19, 2005); *see also C.K.H., LLC v. The Quiznos Master, LLC*, No.04-1164, Order at 6 (D. Colo. Mar. 25, 2005) (rejecting claim that Quiznos breached a franchise agreement by failing to pursue a viable location for the plaintiff and holding that Quiznos' "Franchise Agreements specifically contemplate that the franchisee will be responsible for finding an acceptable location, and gives [Quiznos] the right to terminate the agreement if a store is not opened within one year."). Further, under the terms of the franchise agreements, "each set of [franchisees] were required to perform their own due diligence with respect to the demographics, traffic flow, population and other statistics with respect to the restaurants." *RHC, LLC*, 2005 WL 1799536 at *4.

[10] Indeed, courts have applied this provision to preclude claims based on alleged representations of sales agents prior to signing the franchise agreement. *See C.K.H., LLC v. The Quiznos Master, LLC*, No.04-1164, Order at 6 (D. Colo. Mar. 25, 2005) (rejecting claims based on merger clause premised on salesperson's alleged promises that were not found in the franchise agreement).

agreement requires franchisees to open stores within 12 months, and gives Quiznos the option to terminate and/or seek prospective royalty payments as damages should the franchisee fail to perform.  (App. 00012, Franchise Agreement § 6.9 (12 months to open a store); App. 000030-31, Franchise Agreement § 18.2(j) (failure to open within required time period is grounds for termination); App. 000038, Franchise Agreement § 21.3 (lost future royalty payments).)

## C.    THE NAMED PLAINTIFFS

The named Plaintiffs consist of sixteen individuals with ten Quiznos franchise agreements.  Each purchased a Quiznos franchise between 2003 and 2004.  (App. 000389-390, Effective Date Chart.)  To date, none have opened a Quiznos store.[11] Some have an "active" agreement, some have an agreement terminated by Quiznos, some signed releases, and some have claims barred by contractual and/or statutes of limitations periods.  In the Amended Complaint, Plaintiffs assert that Quiznos allegedly led them to believe that it would provide site selection and other assistance to ensure that each individual franchisee opened a store within 12 months and each expected to receive more assistance in the site selection process than he or she received.  (Am. Compl. at 19-23, ¶¶ 58-68.)  Some of them also claim Quiznos knew but did not tell them the area in which they agreed to look for their store would not have a viable site. They also claim that Quiznos allegedly failed to disclose that it might take longer than 12 months to identify a site, negotiate a lease, build out and furnish the property, and open a store.  (Am. Compl. at 24, ¶¶ 70-71.)

---

[11] Franchisees that have not yet opened their store are referred within Quiznos as "SNOs," for franchisees that are "sold not opened."

Plaintiffs claim that such alleged misrepresentations and omissions violate the Colorado Consumer Protection Act ("CCPA"), and constitute fraud in the inducement, breach of contract, violation of the covenant of good faith and fair dealing, and unjust enrichment and warrant declaratory relief.  Some also assert that they should not be bound by the release he or she provided.  These Plaintiffs provided releases to Quiznos in consideration for Quiznos' agreement to waive its right to lost future royalties or other damages in connection with the termination of their franchise agreement or agreement to extend the 12-month term (*see* Amended Complaint, ¶¶ 124-126).  These Plaintiffs also allege that the releases they signed are invalid as allegedly procured under duress.

The named Plaintiffs came from different experiences:

- Many operated their own various businesses or had business experience prior to becoming a Quiznos franchisee, and one previously owned and operated two *Curves* franchises.[12]

- Some were previously involved in litigation where the amount in issue ranged from $10,000-$75,000.[13]

- Most have college degrees in various fields; and several have either graduate degrees or professional certifications.[14]

- They allege that they reviewed to varying degrees certain various of Quiznos' promotional materials on its website, or went online to fill out an application to become a franchisee.[15]

---

[12]   (App. 000398-399, Prior Business Experience.)  Indeed, one named plaintiff owned *two* Curves franchises before purchasing her Quiznos franchise, (App. 000808-809,  Whitehall Tr. 31:18-32:6) and Plaintiff Varrato was the Vice-President of a deli for C&S Wholesalers, (App. 000781, Varrato Tr. 17:4-13.)

[13] (App. 000810-811, E. Whitehall Dep. 63:1-64:20 (Whitehall demanded $75,000 in damages resulting in her sale of a Curves franchise; case settled for $43,000); App. 000745-748, A. Sliwowski Dep. 37:22-40:15 (at issue was $25,000 down payment for house purchase); App. 000779, R. Varrato Dep. 15:14-16:2 (Varrato settled claim regarding food poisoning for $10,000).)

[14]   (App. 000391-392, Educational Background Chart.)

- All signed a statement confirming receipt of a UFOC, though some admit they chose not to read it, or all of it, and one alleges he did not receive the UFOC before signing the franchise agreement even though he signed a receipt that he had.[16]

- Most attended a Quiznos sales presentation at one point or another and had different direct communications with individual Quiznos sales people or area directors either at those meetings or in separate follow up communications that caused them to sign their franchise agreement.[17]

- All signed the franchise agreement, but none consulted an attorney before signing notwithstanding the recommendation by Quiznos to do so.[18]

Other differences between and among the named Plaintiffs (and the members of the classes they seek to represent) are even more notable than any similarities. Significantly, Plaintiffs allege that they each relied on individual alleged "statements" and "promises" and "representations" of viability of an area to support a store and/or of site selection and other assistance from Quiznos in signing a franchise agreement and paying the $20,000 to $25,000 franchise fee.  The alleged "statements" or "promises" or "representations" of assistance separate and apart from what is reflected in the UFOC and franchise agreement came in *different* forms, at *different* times, at *different* places, and from *different* people.[19]  For example, Plaintiff Makki alleges that area director Renee Alexander told her that "sites are going fast"; but she does not claim she was

---

[15] (App. 000400-403; 000396-397, Varied Promises Chart; Independent Online Research Chart.)

[16] (App. 000404-405, Advance Disclosures Chart.)

[17] (App. 000400-403, Varied Promises Chart  (A. Bonanno Decl. at 2-4, ¶¶ 4-8; B. Klatt Decl. at 2-4, ¶¶ 5-9; Sliwowski Decl. at 2-3, ¶¶ 4,5; Makki Decl. at 2-4, ¶¶ 5-8; N. Desai Decl. at 2-4, ¶¶ 4-8; P. Malhi Decl. at 2-4, ¶¶5-11; R. Varrato Decl. at 2-4, ¶¶ 5-9; K. Lewis Decl. at 2-4, ¶¶ 4-8; )

[18] (App. 000387-388, Franchise Agreement Chart.)

[19] (App. 000400-403, Varied Promises Chart.)

promised any level of assistance.  (App. 000631, M. Makki Dep. 69:13-23.)  Plaintiff

Sliwowski, on the other hand, testified that Quiznos sales agent Robert Tobias stated in

meetings that Quiznos would "work with" him to find locations and "help" open his store.

(App. 000765, A. Sliwowski Dep. 184:3-14.)  Indeed, there are discrepancies in the

alleged statements made with respect to the *same* franchise.  Plaintiff Anthony Bonanno

testified that Argow promised to "assist"—but never guaranteed—to find a site.  (App.

000421, 429-430, 432-433, A. Bonanno Dep. 54:16-20, 62:20-63:17, 75:19-76:17.)  By

contrast, his father, Raymond Bonanno, testified that Argo *did* promise to find them a

site.  (App. 000444-446, 456, R. Bonanno Tr. at 16:6-22, 17:21-18:7, 89:7-14.)  Plaintiffs

also signed their respective franchise agreements at *different* times ranging from March,

2003 to January, 2005.[20]

The named Plaintiffs also engaged in varying degrees of effort to satisfy their

contractual obligation to locate a suitable site.  Most identified at least one potential

location; but Plaintiff Whitehall never proposed a single site.[21]  Several Plaintiffs

proposed a few sites, none of which were suitable or available for different reasons.[22]

Some allege that Quiznos directed them to "bad" sites; others claim that Quiznos

---

[20] (App. 000389-390.)

[21] Quiznos, on the other hand, offered to sell her an existing store in Stuart, Florida—which she rejected.  Quiznos also proposed a possible location in the Forest Hills and Congress area, with the later site falling through because the landlord never began construction on the location.  (Whitehall Decl. at ¶¶ 5, 6, 9-10, 12.)  Subsequently, Quiznos offered to sell her a separate existing store within 5 miles of her home, which she declined to purchase.  (*Id.* at ¶¶ 6-7, 13.)

[22] The Bonannos and Peter submitted sites to Quiznos which Quiznos approved, but the location fell-through because of the landlord.  (App. 000438-440, A. Bonanno Tr. 122:7-124:8 (proposed David's Bridal location but landlord would not subdivide); App. 000457-458, R. Bonanno Tr. 100-:7-101:16 (Quiznos approved a site but the landlord backed out).  A subsequent location also fell through and the Bonannos declined to purchase an existing store.  (A. Bonanno Decl. at 5-6, ¶13-14 (deal for second location fell through and they were offered an existing store to purchase).)

"ignored" their requests for help or never provided any site leads.  (Class Cert. at 12-13; App. 000393-395).

On the other hand, each named Plaintiff describes different levels of assistance from Quiznos.  In fact, based on the named Plaintiffs' testimonies, Quiznos engaged in varying degrees of extensive efforts to attempt to help the named Plaintiffs find suitable sites and open their stores—even though it was not contractually obligated to do so.[23]  It was, of course, in Quiznos and its sales representatives' financial interest to open stores as a franchisee's failure to ever open a store means no future stream of royalty payments to Quiznos or its sales representatives.  (A. Pillari Decl., at 1, ¶3); *see also Scholtzksy's, Ltd. v. Sterling Purchasing & Nat'l Dist. Co.*, 520 F.3d 393, 407 (5th Cir. 2008) ("[t]he success of franchisor and franchisee are interrelated").  Such efforts included providing a list of proposed sites in a particular target area and identifying specific sites for the plaintiff franchisees to consider.  (App. 000393-395.)  Quiznos also hired additional employees to help franchisees with site selection, lease negotiation and construction.  (App. 000393-395, Named Plaintiffs' Efforts to Locate Suitable Sites.) Indeed, Quiznos has sold approximately 9,100 franchises since 1999, and approximately 5,800 have led to open stores.  (Carri Bryan Decl. at 1, ¶7.)  Despite Quiznos' efforts, none of the named Plaintiffs have ever opened a Quiznos store.

## D.   QUIZNOS' SNO MANAGEMENT PROGRAM

By early 2006, numerous factors had led to a number of franchisees who had not opened their store within 12 months.  Quiznos routinely allowed franchisees to remain

---

[23] (*See* App. 000393-395.)

with "active" agreements and hoped those franchisees would find an available, approvable site and get their store opened.  (Carri Bryan Decl. at 2, ¶9.)

Prior to the creation of the SNO Management program, its field persons were charged with the specific responsibility of tracking SNOs and assisting SNOs in their efforts to secure a site and open their restaurants.  Then, in 2006, Quiznos added to the support of SNOs by creating a centralized process to assist the field personnel to do this and to get stores open.  (App. 000834, Michael Daigle Dep. 120:1-17, March 12, 2008; App. 000849, Kyle Gjersee Dep. 96:14-21, March 13, 2008.)  Referred to as the SNO Management program, Quiznos hired people to identify, reach out and help those franchisees who were struggling to fulfill their contractual obligations to open their Quiznos store.  (App. 000835-836, 841-842, Daigle Dep. 127:2-128:2; 236:20-237:2.)

The fundamental goal of the SNO Management program was to identify and help existing franchisees open stores.  (App. 000849-850, Gjersee Dep. 96:17-20; 170:20-23.)  Throughout 2006 and into 2007, Quiznos attempted to contact these franchisees.  Whenever a franchisee expressed willingness to keep trying, Quiznos agreed to extend the 12 month period (which in most cases had expired months if not years before) and work with the franchisee to identify a suitable location and ultimately open a store.  In connection with the extension, Quiznos released its right to terminate the agreement and recover its damages flowing from the franchisee's breach in exchange for a release from the franchise.  (App. 000843, Daigle Dep. 260:1-16; 270:1-14.)  In other instances, for many different reasons, the franchisee indicated he or she did not want to engage in

further efforts to open a store.  (Bryan Decl. at 6, ¶15.)[24]  In those situations, Quiznos offered to terminate the franchise agreement and forego its contractual claim to future royalty payments in exchange for a mutual release.  (App. 000843, Daigle Dep. 260:1-16; App.000845-846, Daigle Dep. Exhibit 152.)  For over 350 franchisees that did not open a restaurant, Quiznos provided at least a partial refund of the initial franchise fee based on the individual facts and circumstances of each case in connection with the termination of the franchise agreement.  (App. 000837, Daigle Dep. 212:7-16.)  A significant number of SNOs moved and left no forwarding contact information or otherwise refused to respond to Quiznos' efforts to engage them in the process.  (App. 000838-840, Daigle Dep. 226:1-228:11.)

Counsel for Plaintiffs were well aware that in March 2006 Quiznos had reached out to franchisees who had not yet opened their Quiznos restaurants and, for those no longer interested in pursuing a Quiznos store, proposed a release as part of a termination agreement.  (Class Cert. at 3-4 (citing declaration of Michael Daigle regarding Quiznos SNO management project and referencing 134 letters that had already been mailed); *see also id.* at 7 ("Quiznos has already confirmed that it <u>will</u> send releases to those franchisees that they have already communicated with as <u>a matter of course</u>." (emphasis in original)).  At the time, Plaintiffs' only complaint was that such letters had been sent to New Jersey franchisees that were members of the putative class without first conferring with them and did not mention this action.  Indeed, Plaintiffs

---

[24] This is confirmed by the testimony of a potential class 2 member, Joe Gibson, who testified that after he opened his first store, he decided not to open a second store, despite his contractual obligation to do so, because the first store was not profitable enough.  (App.000521-522, J. Gibson Tr. 187:2-188:16.)

filed a motion seeking this Court's *approval* of a proposed form of notice that *they conceded* Quiznos could send.  (Plaintiffs' Motion for Approval of the Form of Notice to be Sent to Putative Class, doc. 58, Mar. 2, 2007).  In it, they stated:  "[n]o putative class member should be induced to sign any Release presented to them by Quiznos unless they are first adequately informed of their rights and remedies."  *Id.* at 5.  The parties later stipulated to, and this Court approved, language that Quiznos included in written communications with SNOs regarding releases from that point forward.  (Stipulation of All Parties and Consent Order to Partial Modification of the Court's April 10, 2007 Order at 1, doc. 74, Apr. 27, 2007).

## E.   PRIOR INDIVIDUAL CLAIMS AND LAWSUITS

Over the years, a number of SNOs have made claims for return of some or all of the initial franchise fee for many different reasons.  In this regard, Quiznos has been sued by other franchisees that had not opened a store within 12 months and sought return of the initial franchise fee at least 30 times.[25]  (Bryan Decl. at 3, 6, ¶¶11, 13.)  All of these have been filed by individual or small groups of SNOs; *none* have been pursued as a class action.  (Bryan Decl. at 3, ¶ 11.)  Each of these cases has been resolved under confidential terms.  (Bryan Decl. at 6, ¶14.)

Notably, eighteen of these individual SNOs were represented by the same counsel that now seeks to represent Plaintiffs here.  (Bryan Decl. at 16, ¶14.)  Indeed,

---

[25] (App. at 004747 - 004992 (containing 26 individual SNO case complaints).)  *See, e.g., Braman v. Quizno's Franchise Co., LLC*, No. 5:07-2001, 2008 WL 611607 (N.D. Ohio Feb. 20, 2008) (case was later transferred to this Court as No. 08-cv-00384-WYD-MJW); *Master v. Quiznos Franchise Co.*, No. 06-4253, 2007 WL 419287 (D.N.J. Feb. 1, 2007).  Plaintiffs acknowledge 11 other SNO cases have been filed individually.  (Class Cert. at 37, 28.)

three of the former franchisees whose declarations were presented in support of

Plaintiffs' motion for class certification, previously sued Quiznos (represented by Mr.

Klein) and settled those claims on behalf of *individuals* under confidential terms.  (App.

000933-950, L. Tolan Dep. 6:3-6, 22:11-23:9, 87:3-88:18, 124:2-127:8; J. DiGiovanni

Dep. 11:1-4, 142:11-14, 146:3-148:12; P. Patel Dep. 11:4-10, 27:18-29:9, 52:24-53:12,

54:5-55:20.)[26]

    In addition, numerous franchisees who failed to open a store have made

application to Quiznos for return of their franchisee fee, some with the assistance of

counsel and others not.  (Bryan Decl. at 6, ¶14.)  Quiznos has reviewed each request

on a case-by-case basis, analyzing the claims and reasons for the request in each

instance and awarding refunds in some instances.  (Bryan Decl. at 6, ¶¶15, 16.)

## F.    PROCEDURAL HISTORY OF THIS CASE

    Plaintiffs here originally filed suit in state court in New Jersey in February 2006.

Defendants removed the case under the Class Action Fairness Act and 28 U.S.C.

§ 1453, and on November 24, 2006 the United States District Court for the District of

New Jersey granted Defendants' motion to transfer the case to this Court pursuant to

the forum selection clause in the franchise agreement selecting Colorado as the forum.

(Opinion at 4-10, doc. 23, entered Nov. 17, 2006.)[27]

---

[26] Portions of these deposition transcripts are designated confidential or attorneys' eyes only and are submitted under seal pursuant to the terms of the parties' protective order.  Further, the settlement amount has been redacted.

[27] In so doing, the Court addressed and rejected Plaintiffs' claim that the venue provision of their franchise agreements should not be enforced on unconscionability grounds.  *See Bonanno v. Quiznos Master LLC*, No. 06-CV-01415, 2006 WL 3359673, at *5-6 (D.N.J. Nov. 17, 2006).  (Doc. No. 23.)

Quiznos filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) on January 8, 2007.  (Dckt. No. 41.)  Before the Court ruled on that motion, Plaintiffs filed an Amended Class Action Complaint and Jury Demand on August 1, 2007.  (Dckt. No. 89.)  Quiznos filed a second motion to dismiss on August 27, 2007, (Dckt. No. 103), which was denied on March 5, 2008.  (Dckt. No. 174.)  The parties proceeded to engage in extensive document and deposition discovery.

In April 2008, the parties agreed to stay certain further discovery pending an effort to mediate.  The parties participated in mediation in August before a retired federal judge in Los Angeles, California but were unable to resolve the dispute.  Plaintiffs filed the instant amended motion for class certification, and Quiznos filed an Answer to the Amended Complaint with a counterclaim on September 30, 2008.  (Dckt. Nos. 212, 229.)

## G.    CURRENT STATUS OF SNOS

Today, there are approximately 3,300 current or former franchisees who did not open their store.  (Bryan Decl. at 2, ¶7.)  The reasons for these SNOs' failure to open are varied:  some have been terminated and signed a release; some are active and have signed a release; some have a site or are further in the process of getting their store open; and some have been terminated but have not signed a release.  (Bryan Decl. at 2-3, ¶7.)  Moreover, the length of time that has transpired with respect to their franchise agreements varies greatly.  (App. at 000389-390.)

### III.    ARGUMENT

Plaintiffs seek to certify several nationwide classes of Quiznos franchisees who have been unable for varying reasons to open their Quiznos store.  Their motion should be denied.  As an initial matter, each franchisee waived his or her right to maintain an action against Quiznos on a class-wide basis.  This waiver is enforceable under Colorado law.  This Court can and should enforce the class action waiver provision and deny certification on this basis alone.

Certification also should be denied as Plaintiffs fail to satisfy the predominance, adequacy, superiority and typicality elements of Rule 23.  First, proof of individual issues *specific to each claim* will predominate over any common issue if this case were to be tried as a class action with respect to each cause of action that Plaintiffs allege.  Second, the named Plaintiffs and their counsel cannot fairly and adequately represent the classes they seek to represent because conflicts exist between and among the Plaintiffs, and the putative class members they seek to represent, as well as between Plaintiffs' counsel and their purported clients.  Third, the class action procedural mechanism is *not* the superior way to fairly adjudicate these claims.  These claims can be, and have been, legitimately pursued in individual actions—and at least 37 similar franchisees have done just that, some of whom were represented by Plaintiffs' counsel of record here in those individual actions and many more SNOs have worked out an agreement with Quiznos to resolve any issues without filing a lawsuit, some with and some without counsel.  Fourth, the claims of the named Plaintiffs are not typical of the class members they seek to represent.  This is true for many of the same reasons

showing that individual issues predominate, but also because of the presence of

defenses that Quiznos will raise that are unique to some class members, including

statutes of limitations, releases, and other specific contract defenses.  Further,

certification of Plaintiffs' proposed injunction class—Class 3—should similarly be denied

as no plaintiff is adequate, nor by definition are any of their claims typical, of any

member of that class.  For any or all of these reasons, Plaintiffs' motion for class

certification should be denied.

**A.     A CLASS CANNOT BE CERTIFIED BECAUSE ALL NAMED PLAINTIFFS AND MEMBERS OF THE PUTATIVE CLASS *WAIVED* THEIR RIGHT TO HAVE THESE CLAIMS ADJUDICATED AS A CLASS ACTION.**

Plaintiffs implicitly concede—as they must—that the Franchise Agreement

contains a conspicuous, clear and unambiguous waiver of their ability to adjudicate their

claims as a class action:

> The parties agree that any proceeding will be conducted on an individual, not a class-wide, basis, and that any proceeding between Franchisor and Franchisee or the Bound Parties may not be consolidated with another proceeding between Franchisor and any other entity or person.

(App. 000039, Franchise Agreement § 21.4.)  Colorado courts enforce contracts as

written unless there is ambiguity in the language.  *Mapes v. City Council of Walsenburg*,

151 P.3d 574, 577 (Colo. App. 2006) (citing *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo.

2003)).  This is the case even if a provision benefits one party more than the other.

*Thurmon v. Skipton*, 403 P.2d 211, 214 (Colo. 1965).

### 1.    Class action waivers are enforceable and should be enforced.

Bringing a lawsuit as a class action is a procedural—*not* substantive—right that can be waived. *Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 332 (1980); *Blaz v. Belfer*, 368 F.3d 501, 504 (5th Cir. 2004); *Johnson v. West Suburban Bank*, 225 F.3d 366, 369 (3d Cir. 2000); *Champ v. Siegel Trading Co., Inc.*, 55 F.3d 269, 277 (7th Cir. 1995); *In re Universal Serv. Fund Tele. Billing Practices Litig.*, 300 F.Supp.2d 1107, 1137 (D. Kan. 2003).  Though not yet addressed by the Tenth Circuit, at least five circuit courts have enforced class action waivers. *Jenkins v. First Am. Cash Advance of Ga.*, 400 F.3d 868, 877-78 (11th Cir. 2005); *Iberia Credit Bureau, Inc. v. Cingular Wireless*, 379 F.3d 159, 174-75 (5th Cir. 2004); *Livingston v. Associates Finance, Inc.*, 339 F.3d 553, 559 (7th Cir. 2003); *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002); *Johnson*, 225 F.3d at 378.[28]  Two district courts in the Tenth Circuit—including this Court—have followed the majority trend and declined to invalidate a class action waiver provision in a form contract similar to the Franchise Agreement at issue here.  *See Ornelas v. Sonic-Denver T, Inc.*, No. 06-cv-253, 2007 WL 274738, at *7 (D. Colo. Jan. 29, 2007); *Edwards v. Blockbuster, Inc.*, 400 F. Supp. 2d 1305, 1309 (E.D. Okla. 2005).[29]

---

[28] While these cases differ from the instant action in that the class action waiver was contained within an agreement to arbitrate, this context distinction is without legal significance.  The reasoning and holdings are directly applicable here because the contracts involved a mandatory arbitration dispute resolution process such that the class action waiver in the arbitral context effectively foreclosed the use of *any* class action procedural mechanism.  *See, e.g., Jenkins,* 400 F.3d at 877-78.

[29] In addition, contract provisions that preclude the use of class actions are not automatically unenforceable under Colorado law.  *Rains v. Found. Health Sys. Life & Health*, 23 P.3d 1249, 1253 (Colo. App. 2001) (stating that "arbitration clauses are not unenforceable simply because they might render a class action unavailable").

*Ornelas* is instructive.  Plaintiff Artemio Ornelas, a non-native English speaker, allegedly believed that he had purchased a vehicle when he in fact had signed a lease. *Ornelas*, 2007 WL 274738, at *1.  He sued the dealer on behalf of a putative class of non-native English speakers who had leased vehicles alleging CCPA, fraudulent inducement and fraudulent concealment claims, among others.  *Id.* at *2.  The lease agreement contained a mandatory arbitration provision and a class action waiver that precluded arbitration "as a class action," thus barring Plaintiffs from pursuing a class action at all.  *Id.*  Following the majority of circuits, the *Ornelas* court enforced the class action waiver, *id. at *7*, and this Court should follow suit.

Plaintiffs nevertheless contend that the class action waiver provision should be ignored, relying exclusively on the First Circuit's decision in the antitrust class action, *Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006), as support for that position. (*See* Class Cert. at 39 (quoting *Kristian*, 446 F.3d at 60).)  *Kristian* should not be followed as it reflects the minority view and is distinguishable from this case on a number of grounds.  Indeed, this Court considered—*and rejected*—the reasoning of the *Kristian* court in *Ornelas*.  *Ornelas*, 2007 WL 274738, at *6.

*Kristian* declined to follow the majority trend for reasons unique to that case and antitrust cases generally, none of which are applicable here.  As the *Kristian* court acknowledged, the "sheer complexity" of antitrust cases, including the "great expense and labor" required by Plaintiffs counsel and the necessity of retaining expert witnesses, with potential fees collectively in excess of "several million dollars" made it likely that that claimants could not and would not pursue their claims on an individual basis.

*Kristian*, 446 F.3d at 57-58.  Such was not the case in *Ornelas*, where the court concluded that a claim of $3,582 with potential trebling under the CCPA could be pursued as in an individual claim.  *Ornelas*, 2007 WL 274738, at *6.

The specific concerns that led the *Kristian* court to depart from the majority of circuits that have upheld class action waiver provisions simply are not present here.  If anything, this case presents facts stronger than those in *Ornelas* to support enforcement of the class action waiver.  Here, each named plaintiff is seeking rescission and "damages" in excess of $20,000 not counting alleged trebling under the CCPA and attorneys' fees and costs.  (Am. Compl. at 9-10, ¶29; at 39-40.)  Moreover, numerous Quiznos franchisees, some represented by Plaintiffs' counsel here, have pursued individual remedies.  *See* n. 25 *supra* (discussing previous individual litigations); *see also* Section III(E)*, infra* (discussing superiority under Rule 23(b)(3)).  This Court should follow the majority rule by enforcing the class action waiver provision in the Franchise Agreement and denying Plaintiffs' motion for class certification.

> **2.      The class action waiver provision is not unconscionable.**

Alternatively, each Plaintiff seeks to invalidate the class action waiver provision on the ground that it would be unconscionable to enforce it.  This argument, too, should be rejected.

To establish unconscionability under Colorado law, each Plaintiff would have to establish that there was (a) some overreaching by Quiznos due to circumstances that cause an absence of meaningful choice on his or her part; and (b) the presence of contract terms that are unreasonably unfair to him or her.  *Davis v. M.L.G. Corp.,* 712

P.2d 985, 991 (Colo. 1986); *Leprino v. Intermountain Brick Co.*, 759 P.2d 835, 836

(Colo. App. 1988).[30]   Factors relevant to the unconscionability determination are:

> (1)   a standardized agreement executed by parties of unequal bargaining strength;
>
> (2)   the lack of opportunity to read and become familiar with the document before signing it;
>
> (3)   the use of fine print in the portion of the contract containing the provision;
>
> (4)   the absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated;
>
> (5)   the terms of the agreement, including substantive unfairness;
>
> (6)   the relationship of the parties, including factors of assent, unfair surprise, and notice; and
>
> (7)   all the circumstances surrounding the formation of the contract, including its commercial setting, purpose, and effect.

*Davis*, 712 P.2d at 991.   No one factor is determinative.   *Id.* (noting that factors should

be examined in conjunction with circumstance).

Application of these factors to the various named Plaintiffs' circumstances

demonstrate that there was no "absence of meaningful choice" or that the class action

bar is "unreasonably" unfair such that it should be stricken from the contract as

unconscionable for any of them—let alone all of them and all putative class members.

---

[30]   These two requirements are often referred to as "procedural" unconscionability and "substantive" unconscionability, although most courts applying Colorado law do not generally use those terms.   *See, e.g.*, *Pennington v. Northrop Grumman Space & Mission Sys. Corp.*, 269 F. App'x 812, 818-19 (10th Cir. 2008) (applying New Mexico law and discussing both procedural and substantive unconscionability); *Jenkins*, 400 F.3d at 875-76; *Bragel v. Gen. Steel Corp.*, No. 05-2820, 2006 WL 2623931, at *4 (Mass. Supp. Aug. 2, 2006) (applying Colorado unconscionability law while noting that it was the same as Massachusetts law and determined on "a case by case basis," but not differentiating between substantive and procedural unconscionability).

As their respective depositions reveal, all but one of the named Plaintiffs admit that he or she was given plenty of time to review the franchise agreements—including the class action waiver provision—and to follow Quiznos' recommendation to consult with an attorney before signing.  (App. 000387-388, 404-405)  The class action waiver provision is not set forth in fine print or on hidden "back of the page" sections; rather it is conspicuously included as one term of the Franchise Agreement in the same font and size as all other terms.  (App. 000039, Franchise Agreement § 21.4.)  *Cf. Postnet Int'l Franchise Corp. v. Amercis Int'l, Inc.*, Case No. 06-cv-00125-PSF-BNB 2006 WL 1775599 (D. Colo. June 26, 2006) (enforcing a jury trial waiver clause in a franchise agreement where franchisee not represented by counsel (could have been) and clause was clear and easy to understand).  The relationship between the parties did not remove meaningful choice as each of the named Plaintiffs could have chosen not to sign the Franchise Agreement and opt instead to pursue an independent business, other franchise opportunities or other investment options.  (Bryan Decl. at 2, ¶4 (describing how many prospects inquire about a Quiznos franchise, and stating that only 8.6% of those who applied to become a franchisee signed an agreement with Quiznos).); *see also Postnet*, Case No. 06-cv-00125-PSF-BNB, 2006 WL 1775599 (enforcing jury trial waiver where plaintiff could have declined to become a PostNet franchisee, reasoning "[a] contract clause is not unenforceable merely because one party to the contract insists on it.")  Quiznos had *no* leverage to force assent, launch unfair surprises, charge fees, or do anything harmful to any of the named Plaintiffs had

they decided they were no longer interested.  Nor is the class action waiver

substantively unfair.  *See* Section III(A)(1), *supra.*[31]

Indeed, none of the named Plaintiffs assert that he or she failed to read or

understand the class action bar language, or that this provision was inconspicuous, or

that they were not provided the opportunity to consult with an attorney, or that they were

in any way confused about it.  Instead, counsel merely attempts to characterize the

named Plaintiffs as unsophisticated "consumers" with unequal bargaining power and

challenge the commercial purpose and reasonableness of the class action waiver,

neither of which alone *or* together are sufficient to establish that the class action waiver

should be invalidated as unconscionable as to any named Plaintiff.

The named Plaintiffs have dealt with Quiznos at arms length.  (*See* App. 000035,

Franchise Agreement § 19.1 ("The parties agree that each of them is an independent

businessperson, their only relationship is by virtue of this Agreement, and no fiduciary

relationship is created under this Agreement").  Indeed, the named Plaintiffs are a group

of educated and experienced individuals, nearly all of whom have some sort of college

education, and several of whom have graduate degrees.  (App. 000391-392.)  Most of

them had some sort of business or professional work experience prior to becoming a

Quiznos franchisee, and at least one had owned and operated another franchise.  (App.

---

[31] Further undermining Plaintiffs' argument that they are unsophisticated consumers, at least one court has considered and rejected a similar argument by Plaintiffs' counsel in a separate class-action involving Quiznos franchisees.  *See Siemer v. The Quiznos Franchise Co., LLC*, No. 07-C-2170, 2008 WL 904874, at *7 n.2 (N.D. Ill. Mar. 31, 2008).  In fact, the Seventh Circuit generally presumes franchisees to be sophisticated business investors.  *See We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 843 (7th Cir. 1999); *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992).  Further, the United States District Court for the District of New Jersey rejected these plaintiffs' claim that the venue provision was unconscionable.  *Bonanno v. Quiznos Master LLC*, No. 06-CV-1415, 2006 WL 3359673, at *5-6 (D.N.J. Nov. 17, 2006).

000398-399.)  As the Colorado Supreme Court has acknowledged, a franchise "constitutes an elaborate agreement whereby the franchisee undertakes to conduct business or to sell a product or service in accordance with methods and procedures prescribed by the franchisor, while the franchisor undertakes to assist the franchisee through advertising, promotion, and other advisory services."  *Keller Corp. v. Kelley*, 187 P.3d 1133, 1139 (Colo. 2008).  "The franchisor-franchisee relationship is an arms-length, commercial one with the performance of each governed and regulated by the typically exhaustive terms of written franchise agreements"  *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1183 (D. Kan. 1990) (quotation omitted).[32]

Plaintiffs nevertheless characterize themselves as "consumers" which, they argue, necessarily puts them in an unequal bargaining position with Quiznos sufficient to invalidate the class action waiver provision as unconscionable.  This argument should be rejected.  Contrary to their assertions, the FTC Staff Report on which they rely (and which does not have the force and effect of law) does *not* establish that the FTC distinguishes between "ordinary consumers" and "sophisticated investors."  (Class Cert. at 41 (quoting Staff Report, *Disclosure Requirements and Prohibitions Concerning Franchising* ("FTC Report"), 2004 WL 1945523 (FTC Aug. 2004).)  Rather, the portion of that FTC report quoted by Plaintiffs relates to a 2004 proposal (later adopted by the FTC and codified as 16 C.F.R. § 436.8) to create an *exemption* from the UFOC

---

[32] *See Mr. Steak, Inc. v. Belleview Steak, Inc.*, 555 P.2d 179, 181 (Colo. App. 1976) (a "franchise agreement constitutes a formal contract which establishes the legal relationship between the parties"); *RHC, LLC*, 2005 WL 1799536, at *9 (Quiznos' "Franchise Agreements specifically provide that Quiznos and Plaintiffs' relationship was a normal arms-length business arrangement, and that they did not stand in a fiduciary relationship.").

disclosure requirements when a franchisor sells to a "sophisticated franchisee," which the FTC has defined to include franchisees with five years of prior experience and $5 million in assets, franchisees making an initial investment of $1 million or more, or franchisees who have been officers or owners of the franchisor.  (FTC Report, at *142-143.)  This regulation has nothing to do with class action waiver provisions in a franchise agreement or whether such provisions should be stricken under *state* unconscionability law.  Rather, it serves only to *relieve* franchisors like Quiznos from providing a UFOC to a defined category of franchisees.

Nor should this Court consider the purported expert opinion of Professor Rosenbloom to establish that enforcement of the class action waiver provision would be unconscionable.  First, Professor Rosenbloom's report should be stricken on its face as it is improper (as Plaintiffs admit) for an expert witness to offer an opinion as to the applicable legal standards or the outcome of their application.  *See Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) (citing *Specht v. Jensen,* 853 F.2d 805, 808 (10th Cir. 1988)).  Plaintiffs' attempt to couch Professor Rosenbloom's opinion as not addressing the legal questions at issue is a distinction without a difference and should be rejected.  (Class Cert. at 46, n.12.)  *See Broussard*, 115 F.3d at 345 (class action defendants cannot be "forced to defend against a fictional composite"); *In re Fibreboard Corp.*, 893 F.2d 706, 710-12 (5th Cir. 1990) (vacating on due process grounds a class action trial plan that proposed to determine defendants' liability to class members on the basis of "expert" opinion purporting to like absent class members' facts to those of the

named plaintiffs).  His "opinion" is nothing more than an impermissible (and incorrect) legal conclusion on the question of unconscionability under Colorado law.

Even if the Court were to consider Professor Rosenbloom's opinion, it does not change the outcome.  It consists merely of the unremarkable proposition that Quiznos was in a position of superior bargaining power with respect to at least the named franchisees and offered the franchise agreement on a take it or leave it basis.  (*See* Class Cert. at 44 (quoting Rosenbloom at 4.)  This does not make a contract or a single provision of a contract unconscionable, as Colorado law does not recognize these factors to determinatively establish that a contract is one of adhesion or to invalidate adhesion contracts or contractual provisions based on inequality of bargaining power. *Ad Two, Inc. v. City & County of Denver*, 983 P.2d 128, 132 (Colo. App. 1999) ("Even though a contract is a printed form contract and offered on a 'take-it-or-leave-it' basis, these features alone do not define adhesion contracts."); *see also Clinic Masters, Inc. v. District Court of El Paso County*, 556 P.2d 473, 475 (Colo. 1976).  Further, "an adhesion contract is not created where the only conduct by a party was to use its superior bargaining position to protect its investment by requiring protective terms in the contract." *Ad Two, Inc.*, 983 P.2d at 132 (citing *Batterman v. Wells Fargo Ag Credit Corp.*, 802 P.2d 1112 (Colo. Ct. App. 1990)); *see also PostNet Int'l Franchise Corp. v. Americis Int'l, Inc.*, No. 06-CV-125, 2006 WL 1775599, at *3 (D. Colo. June 26, 2006) ("Although the jury waiver clause was not subject to negotiation, Americis was free to reject the Franchise Agreement and to decline to become a PostNet franchisee.  A contract clause is not unenforceable merely because one party to the contract insists on

it.")  Indeed, in response to similar arguments made previously by the Plaintiffs in this case with respect to the forum selection clause, Judge Cavanaugh held that "[e]ven if Plaintiffs' allegations that the Franchise Agreement[s] [were] presented on a 'take-it-or-leave it' basis and that the parties[] were of unequal bargaining power are accepted as true, these are not sufficient grounds . . . to find that the formation of the agreement was procedurally unconscionable."  *Bonanno v. Quiznos Master LLC*, No. 06-CV-1415, 2006 WL 3359673, at *5 (D.N.J. 2006).[33]  Further, even Professor Rosenbloom conceded that if he had known that several SNOs had previously asserted individual claims, he could change his opinion.  (App. at 000731-737; Rosenbloom Dep. 29:7-35:6 (Q: Would evidence that other Quiznos SNO franchisees had previously hired lawyers and pursued their claims on a non-class basis "be germane to your analysis and might impact one way or another the conclusions that you reached?  A.  Yes").)

Finally, the class action waiver provision in the franchise agreement serves several legitimate commercial purposes, *none* of which include helping assure that Quiznos "will never be held accountable for its legal misdeeds."  (Class Cert. at 43.)  A Quiznos corporate representative has testified that the dispute resolution provisions in

---

[33] Plaintiffs attempt to bolster their argument by citing cases from four other jurisdictions that stand for the unremarkable proposition that franchisors can have more bargaining power than potential franchisees and offer franchise agreements on a take-it-or-leave-it basis.  *None* of these cases led to the invalidation of franchise agreements containing a class action waiver or other remedies clause.  *See Kubis & Perszyk Assocs. v. Sun Microsystems, Inc.*, 680 A.2d 618, 626-27 (N.J. 1996) (addressing forum selection clauses under the New Jersey Franchise Practices Act); *Flower World of America, Inc. v. Wenzel*, 594 P.2d 1015, 1019 (Ariz. Ct. App. 1978) (holding that *despite* a statutory claims of fraud, the arbitration clause in a franchise agreement was still enforceable); *Texas Cookie Co. v. Hendricks & Peralta, Inc.*, 747 S.W.2d 873, 877 (Tex. App. 1988) (holding that the franchisee qualified as a consumer under the Texas Deceptive Trade Practices Act and that franchise agreements involve "goods and services"); *Hengel, Inc. v. Hot 'N Now, Inc.*, 825 F. Supp. 1311, 1315-16 (N.D. Ill. 1993) (holding that an anti-waiver provision of the Illinois Franchise Disclosure Act—language not present in the Colorado statute—prevented a franchisee from waiving their choice of forum).

the franchise agreement (including the choice of law and venue provisions, and jury trial and class action waivers) provide certainty and reduce costs in the resolution of contract disputes with franchisees.  This, in turn, reduces the cost of doing business and creates greater predictability in decision-making, budgeting and planning, for both Quiznos *and* its franchisees.  (App. 000853-912, A. Powers Dep. 77:24-136:10.)  In addition, the class action waiver does not bar the Plaintiffs and the members of the putative class from pursuing their claims against Quiznos individually.  Indeed, a number of franchisees who have not opened a store within 12 months have done so.  *See* n. 25 *supra* (discussing previous individual litigations); *see also* Section III(E)*, infra* (discussing superiority under Rule 23(b)(3)).

In sum, Plaintiffs clearly and unequivocally waived their right to pursue their claims as a class when they signed their franchise agreements.  The class action waiver provision should be enforced, and plaintiff's Motion for Class Certification should be denied.

## B.  PLAINTIFFS FAIL TO SATISFY THE "RIGOROUS ANALYSIS" NECESSARY TO SUPPORT CERTIFICATION UNDER RULE 23.

Even if the named Plaintiffs had not waived their right to pursue claims on a class-wide basis, to certify a class, they would still have to establish all of Fed. R. Civ. P. 23(a)'s requirements—numerosity, commonality, typicality, adequacy of representation—and the requirements of either Rule 23(b)(3) (predominance and superiority) or 23(b)(2).  *Gen. Tele. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10th Cir. 1974). Although this Court has discretion in deciding whether to certify a class, "that discretion

must be exercised within the framework of [R]ule 23." *Shook v. El Paso County*, 386 F.3d 963, 968 (10th Cir. 2004) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 561 (5th Cir. 2002)).  Thus, this Court must apply a "strict burden of proof" and conduct a "rigorous analysis" to ensure all elements of Rule 23 are met.  *Rex v. Owens ex rel. Oklahoma*, 585 F.2d 432, 435 (10th Cir. 1978); *Falcon*, 457 U.S. at 161; *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (applying "rigorous analysis" standard to Rule 23(a) and (b) requirements); *In re Am. Medical Sys., Inc.*, 75 F.3d 1069, 1078-79 (6th Cir. 1996) (same).  "[T]he Court need not . . . rely solely on the substantive allegations in the complaint, but may consider other evidence presented by the parties in determining whether Plaintiffs have satisfied the elements of Rule 23."  *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 554 (W.D. Wash. 2008); *see also Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1177 n.2 (9th Cir. 2007) ("courts are not only at liberty to but must consider evidence which goes to the requirements of Rule 23 even if the evidence may also relate to the underlying merits of the case.") (quotations omitted)).

### 1.   PLAINTIFFS CANNOT SATISFY THE PREDOMINANCE REQUIREMENT UNDER RULE 23(b)(3).

As Plaintiffs correctly note, the predominance analysis requires "identification of the relevant factual and legal issues, and the elements of the claims and defenses," rather than any discussion of the merits.  *Joseph v. General Motors Corp.*, 109 F.R.D. 635, 641 (D. Colo. 1986).  Plaintiffs, however, fail to recognize that the issues should be capable of resolution "for all members of the class in a single adjudication" to be suitable for disposition via a class action.  *Id.*  That is, to satisfy their burden, Plaintiffs

would need to establish that questions of law and fact common to the member of the purported class(es) predominate over any questions affecting only individual members. Fed R. Civ. P 23(B)(3).

This, Plaintiffs have not done.  The fraud, contract and equitable claims alleged in this case, as well as the relevant defenses, are by their very nature *premised* on statements, provisions, actions, and other factors that are specific to each named plaintiff and each individual member of the classes they seek to represent.  *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340-41 (4th Cir. 1998) (denying certification where fraud claims were based on "shifting evidentiary sands of individualized representations to franchisees").  As described below, each claim brought by the Plaintiffs involves individual business relationships, requiring substantial investigation of individual factors.  As a result, common issues do not predominate and the proposed class action is unsuitable for certification.

### a.    CCPA and Fraud

Plaintiffs' CCPA and fraudulent inducement claims are premised on alleged misrepresentations and omissions by Quiznos.  The alleged misrepresentations and omissions relate to alleged promises regarding the site selection and other assistance Quiznos would provide to franchisees, the time it may take for a franchisee to open a store, and the viability of some of the Plaintiffs' trade or search areas.  (Class Cert. at 27.)  Individualized issues necessarily predominate over common ones, as proof of specific misrepresentations or omissions and which Quiznos' materials each plaintiff reviewed will vary between Plaintiffs, as will proof of causation and reliance.

To prove fraudulent inducement, Plaintiffs must establish:  (1) a misrepresentation of a material fact; (2) the plaintiff's reliance on that misrepresentation; (3) that the reliance on the misrepresentation was justifiable; and (4) that the justifiable reliance resulted in damage.  *J.A. Walker Co. v. Cambria Corp.*, 159 P.3d 126, 132 (Colo. 2007).  To prove the CCPA claim, Plaintiffs must establish:  (1) that Quiznos engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of Quiznos business; (3) that it significantly impacts the public as actual or potential consumers of Quiznos goods; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.  *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-147 (Colo. 2003).

Individual issues necessarily predominate as to proof of (1) the alleged misrepresentation and "unfair or deceptive trade practice," and (2) causation, both of which are essential elements to Plaintiffs' CCPA and fraud claims.  On the first, proof of identification of the alleged misrepresentation or deceptive trade practice will necessarily be individual for each plaintiff and member of the class.  Indeed, while statements reflected in Quiznos' corporate marketing materials, sales seminars, UFOCs, and form franchise agreements were the same at any given period of time, each Plaintiffs' CCPA and fraud claims require analysis of which of these materials he or she *actually* reviewed before choosing to sign the franchise agreement, and this necessarily differs among plaintiffs and the members of the putative class.  (App. at 000396-397, 400-403.)  Two named Plaintiffs admit to not reading the UFOC, five admit

they "skimmed" or "looked through it," three claim they read the entire document, and two do not recall receiving a UFOC (though they signed a receipt for it).  (App. 000404-405.)  The experiences were likewise dissimilar with respect to reading the franchise agreement before signing it.  (App. 000387-388.)

Even more telling of the individualized nature of proof necessary with respect to each Plaintiff are the vastly different claims concerning the alleged verbal representations and promises they each claim to have received from the various salespersons, which allegedly led them to choose to sign the franchise agreement.  As the First Amended Complaint makes clear, the alleged misrepresentations (or omissions) that form the basis for their CCPA and fraud claims came from *different* individual sales agents, area directors or Quiznos representatives, at *different* times, in *different* places, and in *different* substantive forms.  (Am. Compl. at 19-23, ¶¶ 58-68.)  These representations vary strikingly, from offers of mere "help" to assertions of "expert assistance" to expectations that Quiznos "will handle everything."  (Whitehall Decl. ¶ 7, N. Desai Decl. ¶ 9, Varrato Decl. ¶ 7.)  The fact that *some* of the challenged representations appear in standardized statements is not enough to satisfy predominance where, as here, Plaintiffs' claims hinge on the highly individualized alleged communications between each class member and various Quiznos representatives.  *Broussard*, 155 F.3d at 341 (noting class-wide relief improper where fraud claims were based on standardized documents *and* individualized representations to franchisees); *Morris v. Travelers Indem. Co. of America*, No. 05-cv-00727, 2006 WL 166597, at *9 (D. Colo. Jan. 19, 2006) (citing *Brossard*); *see also Sprague v. General*

*Motors Corporation*, 133 F.3d 388, 399 (6th Cir. 1998) (denying class certification in part where each claim depended on that person's interaction with the company despite the fact that class members may have signed the same forms, received the same documents and attended the same meetings).

Individual issues also predominate as to the causation element of Plaintiffs' CCPA and fraud claims. To prove causation, Plaintiffs must establish that they *relied* on the alleged misrepresentations or deceptive statements, which necessarily involves proof that is individualized and cannot be offered on a class-wide basis. *See Crowe v. Tull*, 126 P.3d 196, 210 (Colo. 2006) (stating that a consumer is "harmed by a defendant's violation of the CCPA *if* that consumer had been exposed to the defendant's deceptive advertisements and had either made purchases or had undertaken any other activities *in reliance* on the advertisements") (emphasis added) (discussing *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 973-74 (Colo. 1993)); *see also Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998) (CCPA Plaintiffs must show Defendants' conduct caused the Plaintiffs' injuries); *Grace Brothers Ltd. v. Futro*, No. 06-cv-886, 2007 WL 3023325, at *3 (D. Colo. Oct. 12, 2007) ("To prevail on their fraud-based claims, whether under statutory or common law, Plaintiffs in part must prove they relied on Defendants' misrepresentations or that there is a casual connection between the misrepresentations and the sale of the stock to Plaintiffs").[34] Plaintiffs must also show individual *reliance* on alleged omissions. *See Warner v. Ford Motor Co.*, No.

---

[34] Contrary to Plaintiffs' assertion, showing that a statement "had the capacity or tendency to deceive, even if [they] did not," *Rhino Linings*, 62 P.3d at 148, is pertinent only to satisfying the deceptive trade practice requirement, *Id.* It does not establish the additional and *separate* element of causation.

06-cv-2443, 2008 WL 4452338, at *17 (D. Colo. Sept. 30, 2008) (discussing causation

requirements in a CCPA case alleging an omission).  Several circuit courts have

declined to certify a class when individual reliance will be an issue.  *See Castano v.*

*American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("a fraud class action cannot

be certified when individual reliance will be an issue"); *Sprague*, 133 F.3d at 398

(refusing class status for a reliance-based estoppel claim); *see also Ackerman v. NW.*

*Mut. Life Ins. Co.*, 172 F.3d 467, 471 (7th Cir. 1999) (noting that class representation is

questionable in cases grounded upon "different statements to different customers").

This Court should follow that lead.[35]

The named Plaintiffs all bring different experiences to the equation of whether the

alleged misrepresentation (in which of the various forms) caused them to sign the

franchise agreement or whether reliance was reasonable.  Although Plaintiffs often state

the conclusion that they will demonstrate the "common evidence" for Quiznos' allegedly

deceptive practices, in the end they fail to address how they intend to identify the

specific alleged misrepresentations, omissions and deceptive practices or prove

causation (and reliance) on a class wide basis.  They cannot.  Indeed, Plaintiffs

*acknowledge* that the causation element of their fraud claims will likely need to be dealt

with separately, on an individual basis.  (Class Cert. at 35.)  Any attempt to address the

misrepresentation and "unfair or deceptive trade practice" or the causation elements of

---

[35] Even if the Court deems franchisees as a class to be akin to ordinary "consumers" buying securities, which it should not, it would not entitle Plaintiffs to a "fraud-on-the-market"-type theory. *See Lester v. Percudani*, 217 F.R.D. 345, 352 (M.D. Pa. 2003) (fraud-on-the-market theory not appropriate for cases about individual consumer behavior); *Carpenter v. BMW of N. Am., Inc.*, No. 99-cv-214, 1999 WL 415390, at *3 (E.D. Pa. Jun. 21, 1999) (rejecting use of presumptive reliance theory outside of securities markets).

the fraud and CCPA claims on a class basis would quickly throw this action into a series of mini-trials that would require the trier of fact to sort out and categorize the personal qualifications, characteristics, prior knowledge, and oral and written communications history of thousands of Plaintiffs vis-à-vis Quiznos–a situation which serves neither the interests of efficiency nor the substantive rights of any of any of the parties. *See In re Storage Tech. Corp. Sec. Litig.*, 630 F. Supp. 1072, 1080-81 (D. Colo. 1986) (denying certification where "each individual plaintiff will have to prove actual reliance on some specific statement or omission of material fact."). Thus, any allegations of a common course of fraudulent conduct pale in comparison to the overwhelming number of individual issues. *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255 (2d Cir. 2002) ("a common course of conduct is not enough to show predominance, because a common course of conduct is not sufficient to establish liability of the defendant to any particular plaintiff"); *Thompson v. Jiffy Lube Intern., Inc.*, 250 F.R.D. 607, 616, 629 (D. Kan. 2008) (despite allegation of a "common scheme to defraud all customers," individual issues such as "what oral representations were made to class members, whether such representations were false or misleading, whether the individuals involved relied on such representations, and what damages were caused by or resulted from the representation" would overwhelm any common questions).

### b. Breach of Contract and the Covenant of Good Faith and Fair Dealing

Plaintiffs' claims for breach of the franchise agreement and the attendant violation of the covenant of good faith and fair dealing are similarly unsuited for class action treatment. "It has long been the law in Colorado that a party attempting to

recover on a claim for breach of contract must prove the following elements:  (1) the existence of a contract . . .; (2) performance by the plaintiff or some justification for nonperformance . . . ; (3) failure to perform by the defendant . . . ; and (4) resulting damages to the plaintiff . . . ."  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).  The covenant of good faith and fair dealing attaches to every contract to "'effectuate the intentions of the parties or to honor their reasonable expectations.'"  *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)).  It does not "inject new substantive terms into a contract or change its existing terms."  *Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 623 (Colo. App. 1997).  In this matter, individual issues will predominate with respect to the existence of the contract terms (expressed or implied) at issue and the alleged breach.

Plaintiffs do not allege that Quiznos breached any specific terms in the written franchise agreement; rather, they rest their contract claims on the presence of the language "at a minimum" in § 9.1 of the Franchise Agreement to argue that such phrase creates additional non-expressed extra-contractual obligations on the part of Quiznos. (Class Cert. at 35; Am. Compl. at 32-33, ¶105.)[36]  To the extent this theory has any

---

[36] Plaintiffs' assertion that "[t]he UFOC is specifically incorporated into each franchise agreement and is contractually binding" is without basis in law or fact.  (Am. Compl. at 32, ¶ 104.)  Although the franchise agreements reference the UFOC, (*see* App. 000041, Franchise Agreement § 23.5), it is not incorporated in a contractual sense and federal courts have routinely declined to do so.  *See Bores v. Domino's Pizza LLC*, 489 F. Supp. 2d 940, 948 (D. Minn. 2007), *rev'd on other grounds*, 530 F.3d 671 (8th Cir. 2008) ("The fact that Domino's amended its UFOC, however, is irrelevant.  Rather it is the terms of the Franchise Agreements that control the outcome of the breach-of-contract claim . . . ."); *Inash Corp. v. American Dairy Queen Corp.*, No. cv-688-103, 1990 WL 622095, at *5 (S.D. Ga. Aug. 28, 1990) ("[T]he franchise circular offered by ADQ to prospective purchasers cannot be construed as a contract between the parties.  The circular was simply a disclosure required by the Federal Trade Commission.

viability in the face of the clear merger and integration clause in each franchise agreement, Plaintiffs would need to present *specific* evidence of the *individual* interactions between *individual* franchisees and different Quiznos' representatives to prove the existence and specifics of any such extra-contract terms.  In moving beyond the written contract, Plaintiffs essentially allege the existence of individual oral and/or written agreements, each unique to any franchisee who claims to have had an expectation that site selection assistance would be greater than the contractual minimum or claims to have believed their search area had characteristics that would support a store.  Each individual's expectation, whether it was reasonable, whether it was supported by consideration, whether the parol evidence rule bars such a claim, and whether Quiznos met whatever that expectation was, all require individual proof.  Proof of the variation of these individual agreements and their oral nature predominate, making Plaintiffs' contract and covenant of good faith and fair dealing claims unsuitable for class certification.  *See, e.g., Sprague*, 33 F.3d at 398 (finding separate contracts with individual class members lacking in commonality for class certification); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 n.17 (7th Cir. 1993) (noting that "claims based substantially on oral rather than written communications are inappropriate for treatment as class actions"); *Broussard*, 155 F.3d at 340 (holding that multiple different contracts cannot sustain a class action).

Even if Plaintiffs could establish unwritten terms of different franchise agreements with common proof (which they cannot), Plaintiffs would still need to prove

---

Neither party signed the circular.  The rights and obligations of the parties are manifested in ADQ's franchise agreement . . . .").

that Quiznos breached such terms with respect to *each* member of the purported classes or failed to "effectuate the intentions" of each franchisee with respect to those provisions.  This necessarily would require an individualized analysis of the actions taken by Quiznos with respect to *each*, *individual* class member.  *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1264 (11th Cir. 2004) (denying certification on contract claim when proof of breach "cannot be lumped together and condemned or absolved en masse") (citing *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1024 (11th Cir. 1996).  Thus, individualized issues predominate over any common issues on the issue of breach.

As Plaintiffs themselves point out, Quiznos' process for dealing with franchisees encountering problems meeting their contractual obligations was individualized— different salespeople, real estate consultants and managers responsible for shepherding franchisees through the process dealt with such issues on an individual and personalized basis.  (Class Cert. at 31-32.)  Because of this individual treatment, to prove breach, plaintiffs would be required to present evidence with respect to each individual's experience and Quiznos would need to defend any such claim with proof relating to its actions with each individual franchisee.  The Court would need to evaluate what Quiznos *did* (or allegedly did not do) with respect to each class member to conclude whether Quiznos *breached* its contractual obligations and its duty to act in good faith with respect to those obligations.  Proof of Quiznos' alleged breach cannot be made on a class wide basis and will necessarily require separate trials of each class member to establish the relevant facts.  *See, e.g., Monreal v. Potter*, 367 F.3d 1224, 1237 (10th Cir. 2004) (finding no predominance where plaintiffs would need to prove

multiple individual prima facie cases in order to show a pattern of discrimination sufficient to certify a class); *Parks Automotive Group, Inc. v. General Motors Corp.*, 237 F.R.D. 567, 572 (D.S.C. 2006) (holding that where dealer franchise agreements presented individual issues for litigation class certification was inappropriate).[37]

### c.    Equitable Claims

Plaintiffs' claims for unjust enrichment, economic duress and declaratory judgment suffer the same problem:  individual factors overwhelm any common issues such that Plaintiffs cannot meet their burden with respect to the predominance requirement under Rule 23(b)(3).  To establish unjust enrichment "the plaintiff must show that she conferred a benefit on the defendant "under circumstances that would make it unjust for defendant to retain the benefit without paying."  *DCB Constr. Co. v. Cent. City Dev. Co.,* 965 P.2d 115, 119-20 (Colo. 1998).  In other words, each Plaintiff would need to show that, given the circumstances, it would be unjust for Quiznos to keep the franchise fees paid by that Plaintiff.

To prove that Quiznos' retention of the franchise fee was "under circumstances" that are "unjust," would require factual inquiries into the individual "circumstances" of each plaintiff to evaluate whether retention of the fee (which each franchisee agreed Quiznos could retain when he or she signed the franchise agreement) is somehow unjust.  *See Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 500 (S.D. Ill. 1991) (unjust

---

[37] Several named plaintiffs' claims are also barred by the one-year contractual limitations period in the Franchise Agreement.  (App. 000039, Franchise Agreement § 21.4) ("any claims between the parties must be commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claim, or such claim shall be barred"); Am. Compl. at 3 & 5, ¶¶4 & 12; A. Sliwowski Decl. at 3, ¶5; App. 000479; N. Desai Dep. 64:9-11; App. 000504, R. Desai Dep. 70:20-23.)  Individual issues would similarly predominate with respect to application of the limitations period as to each member of the class.

enrichment "depends upon the analysis of each individual situation"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 69 (S.D.N.Y. 2002) (noting that "the question whether an individual class member got his or her money's worth is inherently individual").  The franchise agreement does not guarantee that payment of the franchise fee leads inexorably to the opening of a functioning, profitable restaurant within 12 months, nor does it provide for "your money back" when a franchisee fails to open a store.  Quite the opposite.  An individual SNO's failure to open a store does not automatically render Quiznos' retention of the non-refundable fee "unjust," if it ever is.  And it is difficult to imagine what evidence Plaintiffs would try to point to in an effort to show unjust enrichment other than the same evidence for the alleged fraud and contract claims discussed above, all of which require extensive individual analysis.  They certainly have pointed to no evidence that is capable of common proof.  As the determination of the "unjustness" is likely to be almost exclusively case-by-case, common issues do not predominate and the claim is not suitable for class action treatment.

The Plaintiffs' economic duress claim applies only to the portion of the purported classes members who signed a release, many times as consideration in connection with the agreed termination or extension of their franchise agreement, but also under a variety of other circumstances.  Some members of Class 1 signed a mutual release as part of their termination as a Quiznos franchisee.  (C. Bryan Decl. at 3, ¶¶ 8-10.)  Others in Class 2 voluntarily amended their Franchise Agreement to extend the 12 month term in exchange for a release of all claims against Quiznos.  (C. Bryan Decl. at 3, ¶¶ 8-10.)  Plaintiffs' counsel were well aware of Quiznos' inclusion of a mutual release in the

termination and other agreements negotiated with SNOs—indeed, they filed a motion in

this action insisting that Quiznos provide information about this instant action when

negotiating such releases.  (Plaintiffs' Motion for Approval of the Form of Notice to be

Sent to Putative Class, Dckt. No. 58, Mar. 2, 2007.)  The parties later *stipulated* to, and

the Court approved, mutually agreed upon language to accomplish this.  (Stipulation of

All Parties and Consent Order to Partial Modification of the Court's April 10, 2007 Order

at 1, Dckt. No. 74, Apr. 27, 2007.)

Under Colorado law, "[a] contract is voidable on the grounds of duress if a party's

manifestation of assent is induced by an improper threat that leaves no reasonable

alternative."  *Vail/Arrowhead, Inc. v. District Court,* 954 P.2d 608, 612 (Colo. 1998)

(citing Restatement (Second) of Contracts § 175 (1981)).  Plaintiffs argue that such

releases were induced by an "improper threat" that left the franchisees with "no

reasonable alternative."  (Class Cert. at 33-34.)  Proving this would inevitably involve

facts specific to the circumstances surrounding each franchisees' decision to sign the

release, including what the Quiznos representative involved said or did or didn't say or

didn't do (and whether any of that constitutes an "improper threat" under Colorado law)

and whether *for each class* member there existed reasonable alternatives to signing.

These individual questions will predominate over common ones with respect to the

economic duress claim.

Finally, Plaintiffs' final claim for declaratory judgment regarding the enforceability

of the franchise agreements suffers from the same issues that each of the other claims

does – in order to find grounds for a declaratory judgment, the court is required to make

individual determinations as to whether any contract term or franchisor behavior was

unfair as applied to an individual franchisee.  In order to find a contract provision

unconscionable such that it is against public policy, a court applying Colorado law

applies a multi-factor balancing test that implicates the plaintiffs' individual

characteristics as well as all of the circumstances surrounding the agreement between

the parties.  *See* Section III(A)(2) *supra.*  Colorado law does recognize that declaratory

relief may in some circumstances be suitable in class actions, but only in cases where,

unlike here, the determination of the parties' rights and the proposed remedy is the

same for every class member.  *See Shook v. Board of County Commissioners of

County of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) ("if redressing the class

members' injuries requires time-consuming inquiry into individual circumstances or

characteristics of class members or groups of class members, the suit could become

unmanageable and little value would be gained in proceeding as a class action")

(citations omitted).  Because the court would need to make an individual determination

as to the enforceability of the agreement with regards to any particular plaintiff, and then

make individual determinations as to the appropriate remedy for each plaintiff, the

Plaintiff's request for declaratory judgment is unsuitable for class action certification.

In sum, individual issues predominate over common ones as to specific requisite

elements for each of the claims Plaintiffs assert, which makes this case unsuitable for

class action treatment.  Certifying the proposed classes ensures only that this case will

degenerate into mini-trials for each class member on every claim, hindering and

delaying the ability of each party to make individualized arguments while generating

none of the efficiency benefits for which class actions were developed.  Certification

should be denied on this basis alone.

### d.      State Law Considerations

Finally, predominance is undermined by the different states' laws that could be

applicable to certain aspects of some members of the classes claims.  Plaintiffs ignore

possible individual state law franchise act claims, which they have waived by not

asserting in this action.[38]  By doing so, Plaintiffs elide the fact that some state law

franchise acts may invalidate a Colorado choice of law provision.  (*See*, *e.g.*, App.

000360-367, UFOC, Ex. K.)  Indeed, some states, like Illinois require that the parties

agree that a different law applies.  The potential application of different states' laws with

respect to some members of the purported classes would only compound the

multiplicity of legal issues and possibly raise additional factual issues for the court to

resolve as it attempted to sort out the often differing legal elements of the claims under

the state law of any state that invalidates a choice of law provision.  *See Thompson*,

250 F.R.D. at 626 ("federal courts have generally refused to certify a nationwide class

based upon a theory of unjust enrichment" due to differences in various state laws).

This complication might also carry over to Plaintiffs' request for punitive damages, or the

---

[38] Eighteen States and two U.S. Territories have statutes governing the franchisor-franchisee relationship:  Arkansas, ARK. CODE ANN. §§ 4-72-201 to 4-72-210; California, CAL. BUS. & PROF. CODE §§ 20000-20043; Connecticut, CONN. GEN. STAT. §§ 42-133e to 42-133h; Delaware, DEL. CODE ANN. tit. 6, §§ 2551-2556; Hawaii, HAW. REV. STAT. § 482E-6; Illinois, ILL. COMP. STAT. 705/18-705/20; Indiana, IND. CODE §§ 23-202.7-1 to 7; Iowa, IOWA CODE §§ 523H.1-523H.17; Minnesota, MINN. STAT. § 80C.14 (1996); Mississippi, MISS. CODE ANN. §§ 75-24-51 to 75-24-63; Missouri, MO. REV. STAT. §§ 407.400 to 407.410, 407.413 & 407.420; Nebraska, NEB. REV. STAT. §§ 87-401 to 87-410; New Jersey, N.J. STAT. ANN. §§ 56:10-1 to 56:10-12; South Dakota, S.D. CODIFIED LAW § 37-5A-51; Virginia, VA. CODE ANN. §§ 13.1-557 to 574; Washington, WASH. REV. CODE §§ 19.100.180 & 19.100.190; Wisconsin, WIS. STAT. §§ 135.01 to 135.07; Puerto Rico, P.R. LAWS ANN. tit. 10, §§ 278 to 278d; and the U.S. Virgin Islands, V.I. CODE ANN. tit. 12A, §§130 to 139.  No claim was filed by Plaintiffs under any of these State acts.

applicable statutes of limitation.  *See Thompson*, 250 F.R.D. at 627 ("different states have different threshold standards for awarding punitive damages, including different standards of intent and standards of proof, not to mention widely varying limitations on recoverable amounts" which would inevitably give rise to "material conflicts between the law of Kansas and the laws of the other states insofar as a claim for punitive damages is concerned*"); Corley v. Entergy Corp.*, 220 F.R.D. 478, 487-88 (E.D. Tex. 2004) (denying class certification where the "fact-intensive and individualized" statute of limitations inquiry was compounded by differing limitations periods across various states).  As a consequence, federal courts routinely reject class actions that require the court to sort through differences in various state laws.  *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 725-26 (5th Cir. 2007) (rejecting certification of class action asserting claims of breach of express and implied warranty); *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 288 F.3d 1012, 1015-18 (7th Cir. 2002) (rejecting certification of class action asserting claims of breach of warranty and consumer fraud); *Zinser v. Accuflix Research Inst., Inc.*, 253 F.3d 1180, 1189 (affirming that "variances in state laws overwhelm common issues of fact"), *amended by* 273 F.3d 1266 (9th Cir. 2001); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) (stating in the context of a proposed nationwide class action that "[i]f more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law").

**2.    The representative plaintiffs and the counsel they have selected cannot "fairly and adequately protect the interests of the class"**

Due process demands that the adequacy requirement be "stringently applied" because members of a class are bound by the outcome of the class action, even though they may be unaware of the proceedings. *Rathbun v. Qwest Communications Int'l.*, 458 F. Supp. 2d 1238, 1247 (D. Colo. 2006) (quoting *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10th Cir. 1974)); *see also Amchem Products Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  Neither the adequacy of the named Plaintiffs nor the adequacy of class counsel can be presumed; as with all other requirements of Rule 23, Plaintiffs bear the burden of establishing that the adequacy requirement has been met.  *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001) (reversing certification because district court presumed adequacy of counsel and Plaintiffs, improperly shifting the burden of proof to the party opposing certification).

**a.    The Interests of named Plaintiffs are in conflict with other class members.**

"It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent." *Albertson's, Inc.*, 503 F.2d at 463 (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)).  Plaintiffs cannot be adequate representatives because their own interests are in conflict with each other, as well as with putative members of the proposed classes.

Plaintiffs seek to certify three classes:  Class 1, consisting of those whose franchise agreements have been terminated; Class 2, consisting of those whose franchise agreements have not been terminated and who remain Quiznos' franchisees;

and Class 3, which they define as a sub-class of Class 2, consisting franchisees who never opened a store, were not terminated as franchisees, but who elect to opt-out of Class 2 because they still want to open a store.  (*See* Class Cert. at 15-16.)[39]  The three classes the Plaintiffs seek to represent include current *and* former Quiznos franchisees who have not opened a store, some of whom negotiated a full and complete release of all of their claims against Quiznos, some of whom did not, and some of whom may at the appropriate point in the future decide not to participate in this action at all but could nevertheless be forced to become part of the opt-out class.

    This inevitably creates conflicts of interest between and among the class members as to the appropriate relief that should be sought, and this alone is enough to defeat certification.  Plaintiffs have not met their burden of showing the class representatives are adequate in the face of these clear conflicts.  The members of Class 1, the terminated franchisees, have an interest in only maximizing any damages that Quiznos might have to pay to class members, including punitive damages, if available.  (Class Cert. at 24).  Some members of Class 2, however, seek an ongoing business relationship with Quiznos and continue to pursue sites with the goal of opening a store.  They have a direct interest in the long term health of Quiznos and are presumably more interested in opening a store at a suitable site than seeing a large money damage

---

[39] Who among the named Plaintiffs belong to which class is unclear.  Plaintiffs' Motion states that Plaintiff Sliwowski is a member of *both* Class 1 and Class 2.  (Class Cert. at 23-24.)  Plaintiffs also represent that Plaintiff Varrato is a member of Class 2, but the operative complaint alleges that his Franchise Agreement was terminated.  (*Compare* Class Cert. at 24 with Am. Complt. ¶ 7.)  Plaintiffs' motion does not specifically identify who signed releases, but the First Amended Complaint suggests Plaintiffs Malhi and Naqvi did so.  (*See* Am. Compl. ¶¶ 124-126.)  Presumably, no named Plaintiff belongs to Class 3.

judgment imposed upon their franchisor.  *None* of the named Plaintiffs are adequate to represent Class 3 because they presumably will not opt out of a class they seek to certify; nor can it be presumed that any member of Class 3 seeks *any* monetary relief from Quiznos *at all*.

Plaintiffs state simply that they will "vigorously pursue" their claims because "this case provides the only realistic opportunity for these wronged franchisees to get any relief."  (Class Cert. at 24.)  But, they have failed to demonstrate how the remedial interests of these divergent groups of members they seek to represent can be reconciled.  *See Amchem Products*, 521 U.S. at 626-27; *Broussard*, 155 F.3d at 337-338. ("The first obstacle to class treatment of this suit is a conflict of interest between different groups of franchisees with respect to the appropriate relief.").

The Fourth Circuit's decision in *Broussard* is factually analogous and directly on point.  There, the Fourth Circuit reversed the district court's certification of a class action (after a 7 week jury trial ending in a $390 million judgment against Defendants) brought by current and former franchisees against the franchisor for breach of the franchise agreement, unfair trade practices, and related torts.  155 F.3d at 335.  The court grouped Plaintiffs into three sub-groups:  (1) former franchisees; (2) current franchisees who had signed releases of their claims; and (3) current franchisees that had signed no release.  *Id.* at 338.  The court held the district court had erred in ignoring the "manifest conflicts of interest" within the class, including the critical fact that the remedial interests of all class members were not aligned.  *Id.*

Nearly identical conflicts exist here.  The proposed classes consist of both former and current franchisees, some number of which signed releases of their claims in order to either extend their franchise agreement or upon termination, and others who may at some future time elect to opt out entirely.

Further, the named Plaintiffs have abandoned (or waived) their individual state law franchise act claims by filing the present action in this Court without raising claims under the franchising relationship laws in their respective states.  Thus, they are not adequate representatives of class members who may have—and seek to pursue—possible claims under such state franchising laws.  For this and any one of the above reasons, class certification should be denied as the named Plaintiffs are not adequate representatives of the classes of franchisees that they seek to represent.

### b.   Counsel for Plaintiffs have previously represented individual SNOs and that representation puts them in conflict with members of the putative classes.

The same conflicts exist for class counsel making it impossible for them to adequately represent all members of the putative class.  "Realistically, for purposes of determining adequate representation, the performance of class counsel is intertwined with that of the class representative. . . .  [E]xperience teaches that it is counsel for the class representative[s] and not the named parties, who direct and manage these actions."  *Pelt v. Utah*, 539 F.3d 1271, 1288 (10th Cir. 2008)(quotation omitted).  First, it is impossible for putative class counsel to represent the subgroups as defined here given their divergent, and conflicting remedial interests.  *See Broussard*, 155 F.3d at 338 (former franchisees and those who did not amend the franchise agreement stand to

benefit from large damage awards, while current franchisees have a continued interest in defendant franchisor's continued viability an financial health). Certification should be denied on this basis alone.

Second, Plaintiffs concede that their counsel has been "involved in litigation with Quiznos for three years" (Class Cert. at 25) and these other cases include representation of categories of franchisees with different interests and allegations that conflict with the allegations plaintiffs make in this case. Even now, proposed class counsel is simultaneously pursuing class litigation against Quiznos and on behalf of other categories of franchisees in at least three other lawsuits—in Wisconsin, Illinois, and in this court as well. *Westerfield v. Quizno's Franchise Co., LLC*, 527 F. Supp. 2d 840 (E.D. Wisc. 2007), *rev'd in part by* 2008 WL 2512467 (E.D. Wisc. April 16, 2008); *Siemer v. Quizno's Francise Co. LLC*, No. 07-C-2170, 2008 WL 904874 (N.D. Ill. March 31, 2008). In those cases, the named Plaintiffs comprise franchisees who opened their store and some are open and operating today. Some of those Plaintiffs allege Quiznos provided site selection assistance to them and improperly allowed them to open in a bad location and allege Quiznos was more interested in opening stores than making sure the locations were good. This multiple representation of different Plaintiffs against the same defendant creates a conflict that risks affecting litigation strategy and the sought remedy in every case. *See Piambino v. Bailey,* 757 F.2d 1112, 1144-45 (11th Cir. 1985) (in class action in which minority group of members were receiving payments from settlement of defendant established by judgment in another suit, counsel had a

substantial conflict of interest with those class members in representing interests of majority group of class members in pursuing the action).

In addition, and as a result of their representation of individual Quiznos franchisees in prior litigation, Plaintiffs' counsel was well aware of Quiznos SNO Management program and the fact that Quiznos negotiated releases with terminated franchisees or franchisees that elected to extend the 12 month period within which to open a store under the franchise agreement.  Indeed, Plaintiffs' counsel *approved* of language regarding this action to be disclosed to franchisees with whom Quiznos was negotiating or planned to negotiate such releases.  Plaintiffs' counsel are now estopped from taking the position that the releases they knew were being negotiated and failed to object to should be invalidated.  *See Spaulding v. United Transp. Union*, 279 F.3d 901, 909 (10th Cir. 2002) ("Equitable estoppel prevent[s] a party from taking a legal position inconsistent with an earlier statement or action that places his adversary at a disadvantage.") (citations omitted); *see also Herald Co. v. Seawell*, 472 F.2d 1081, 1099 (10th Cir. 1972) (estoppel by acquiescence arises through the inaction of a party at the time an allegedly wrong act or transaction took place).  Application of this estoppel principle alone pits counsel against the interests of members of the proposed class that would seek to invalidate their release, rendering them inadequate to represent these classes.

### 3.    Class Action is not superior to other available methods to fairly and efficiently adjudicate these claims.

In order to satisfy the superiority requirement of Rule 23(b)(3), Plaintiffs would have to demonstrate that a class action is " the best available method for the fair and

efficient adjudication of the controversy." *Clark v. State Farm Mut. Auto. Ins. Co.*, 245 F.R.D. 478, 489 (D. Colo. 2007).  "[I]n many ways, [superiority is] the most important requirement" for class certification. *Steinmetz v. Bache & Co.*, 71 F.R.D. 202, 204 n.4 (S.D.N.Y. 1976).  This is true in part because the potential unfairness to a defendant in a class action, forced to defend a composite case of selective allegations that is "much stronger than any plaintiff's individual action would be." *Broussard*, 155 F.3d at 345. The burden is upon Plaintiffs to demonstrate that the superiority requirement has been satisfied. *Albertson's,* 503 F.2d at 463.

Plaintiffs advance two unavailing arguments to support their assertion that a class action is the superior method of adjudicating claims of the putative class.  First, Plaintiffs contend that the claims of individual members are too small to justify separate actions, and therefore individuals have no incentive to bring or control litigation of their claims.  (Class Cert. at 36-37.)  Second, Plaintiffs argue that efficiency demands certification because absent class treatment the judicial system would be faced with the specter of "more than three thousand separate trials" that would be practically unmanageable.  (Class Cert. at 36.)[40]  Neither argument is persuasive.  As discussed below, the availability of substantial individual recovery for each individual plaintiff, coupled with the myriad of individual issues that need to be litigated even if the class were certified, demonstrate that class treatment is not the superior method for litigating

---

[40] Plaintiffs make no credible attempt to reconcile the tension between its two positions: *i.e.*, that individual SNOs cannot financially bring separate suits, yet if class certification is denied this Court will be faced with the prospect of more than 3,000 separate trials.  (Class Cert. at 36 & n. 9.)  Further, Plaintiffs provide no legal support for their contention that the Court should presume such separate trials would be brought.  If the Court makes such a presumption, it clearly undermines Plaintiffs arguments that individual SNOs will be unable to bring individual suits in the absence of class certification.

Plaintiffs' claims and, indeed, will only be an impediment to prompt resolution of individual claims.  In addition, Plaintiffs have utterly failed to support their speculative and imaginative assertions as to what would occur if this Court denies their motion for class certification.

        **a.**     **The Possibility of Substantial Individual Recovery Means Class Action Is Not Superior to Individual Action**

Among other factors, courts must consider the recovery Plaintiffs could achieve individually when making the superiority determination because class actions are "designed to provide compensation that cannot be achieved through normal channels." *Clark*, 245 F.R.D. at 489*; see also Amchem*, 521 U.S. at 615 (purpose of class actions is to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results") (quotation omitted)).  Where a claim is large enough that it would be economically efficient to bring it alone, class certification should be denied.  *See*, *e.g.*, *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1191 (9th Cir. 2001) (affirming the denial of class certification, in part because the amount of the damages claimed in a complex products liability suit likely made it economically efficient to bring the claims separately); *see also Steinmetz*, 71 F.R.D. at 204 n.4 (denying class certification in securities fraud action because evidence of at least eight individual suits seeking damages between $5,000 and $10,000 indicated claims not so small that class action was mandated).

Plaintiffs here each claim, at minimum, damages between $20,000 and $45,000. Under the CCPA, these damages may be trebled, resulting in individual recoveries

between $60,000 and $135,000.  *See* Colo. Rev. Stat. § 6-1-113(2)(a)(III) (2008).  In addition to damages, both the CCPA and the franchise agreement provide for recovery of attorneys fees and costs.  *See* Colo. Rev. Stat. § 6-1-113(2)(b) (2008); App. 000038, Franchise Agreement § 21.3.  Such substantial individual damages are a persuasive reason to deny class certification on the basis of lack of superiority.  *See Wilcox Dev. Co. v. First Interstate Bank of Or.*, 97 F.R.D. 440, 448 (D. Or. 1983) (denying certification in light of antitrust and RICO claim that permitted treble damages and attorney fees); *Mulford v. Altria Group, Inc.* 242 F.R.D. 615, 631 (D.N.M. 2007) ("Plaintiffs' argument concerning the prohibitive cost of bringing individual suits is wholly undermined by the fact that the UPA awards attorney fees and costs to a successful litigant."); *Commander Properties Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 542 (D. Kan. 1995) (barriers to the pursuit of relatively small individual claims are removed by the availability of attorney's fees or other statutory damages.); *San Antonio Tel. Co., Inc. v. Am. Tel. & Tel. Co.*, 68 F.R.D. 435, 441 (W.D. Tex. 1975) (potential recovery of $30,000 plus availability of treble damages and fees "not the kind of situation Rule 23 was originally designed to protect").

Plaintiffs' reliance on the declarations of two attorneys who ostensibly refused to pursue their claims because "it would make no economic sense to bring an individual suit . . ." is misplaced.  (Class Cert. at 37.)  By his own admission, Plaintiffs' counsel previously represented *individual* SNOs in actions raising similar claims.  (*See* Decl. of Justin M. Klein, Esq. at 4-5, ¶¶ 14-16 (Dckt. No. 222).)  Indeed, Quiznos has defended—and successfully resolved—at least 30 such individual actions by individual

franchisees who did not open a store.  (Carri Bryan Decl. at 3-6, ¶¶11-14.)  Two

Plaintiffs previously filed and adjudicated suits for similar amounts claimed.  Many

courts recognize that the damages at issue here are substantial enough to justify

individual litigation, and Plaintiffs' own counsel is proof of that.  *Compare, e.g.,*

*Thiemann v. OHSL Financial Corp.*, No. 1-00-793., 2001 WL 34142349, at \*6 (S.D.

Ohio Sept. 14, 2001) (noting that potential recovery of between $47,000 and $63,000

per member made the case "unlike cases where class certification is appropriate

because damages to the individual class members are likely to be de minimis"), *with*

*Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 568 (6th Cir. 2007) ("individual suits would

yield only a small amount of damages, because the most each class member would

have paid . . . between 1994 and 2001 is roughly $124.68," and "[s]uch a small possible

recovery would not encourage individuals to bring suit, thereby making a class action a

superior mechanism for adjudicating this dispute"), *and Mace v. Van Ru Credit Corp.*,

109 F.3d 338, 344 (7th Cir. 1997) (noting that class action mechanism was proper when

recovery was in the range of 28 cents to 12 dollars per class member).  Moreover,

"when individual plaintiffs have significant financial interests, they may desire to control

their own claims," which can be established where, as here, there are other pending

lawsuits asserting similar claims.  *Thiemann*, 2001 WL 34142349, at \*6-7 (noting that

only one lawsuit had been filed challenging the transaction at issue).

> **b.      Class treatment is not superior because this case is unmanageable as a class action.**

The same factors relevant to the predominance analysis show that this case

would be unmanageable as a class action, and not the superior method of a fair

adjudication of these claims.  Plaintiffs readily admit that there are issues that require individual determination, such as "the reliance element of the common law fraud claim" and damages.  (Class Cert. at 38.)  Because Plaintiffs' claims create the need for determination of individual issues for each class member, any efficiency gained by certification is negated, entirely undermining a clear purpose of Rule 23.  *Kohn v. Am. Hous. Found., Inc*, 178 F.R.D. 536, 544 (D. Colo. 1998).

*Kohn* is instructive.  There, this court denied certification to Plaintiffs bringing CCPA and negligence claims in part because "the proliferation of individual issues of causation and harm presents significant potential for confusion, inefficiency, duplication, splintering of subclasses, and, indeed, individualization [of issues]."  178 F.R.D. at 544. Indeed, the individualization of issues led this court to conclude that a class action was not superior because the need to make individual determinations regarding causation, harm, and damages "minimizes the effect the common issues might have on judicial economy."  *Id*; *accord Kaufman v. Am. Family Mut. Ins. Co.*, No. 05-cv-2311, 2008 WL 1806195, *4 (D. Colo. Apr. 21, 2008) (particularized inquiry required to resolve plaintiff's breach of contract, fraud, and negligent misrepresentation claims rendered them not suitable for class determination); *Boughton v. Cotter Corp.,* 65 F.3d 823, 826-28 (10th Cir. 1995) (affirming denial of Rule 23(b)(3) class certification in case for negligence, trespass, and nuisance resulting from radiation contamination because individual issues such as "whether purchasers were aware contamination existed, the extent and nature of injuries, the degree and length of exposure, the prevalence of contamination and proof of ownership to water rights" predominated).

The difficulties attendant in certifying a class action with such individual inquiries even overrides the concern not present here that putative Plaintiffs might forego litigation when faced with a potential recovery that could not justify individual litigation. For example, in *Owner-Operator Indep. Drivers Assoc., Inc. v. Swift Transp. Co., Inc.*, the district court held that a class action was not a superior vehicle for litigation because this class action required the resolution of too many individual issues, even though "the claims of the named Plaintiffs and of the proposed class members are relatively small in relation to the cost of adjudicating those claims and it would be uneconomical and procedurally difficult to prosecute the claims on an individual basis."  No. CV-02-1059, 2006 WL 2521183, at *5-6 (D. Ariz. Mar. 30, 2006).  As noted above, that is not the case here.

In addition, Quiznos has asserted counterclaims against the Plaintiffs in this case, which further weighs against a finding of superiority on manageability grounds. *See, e.g., Carter v Pub. Fin. Corp.*, 73 F.R.D. 488, 496 (N.D. Ala. 1977) (where defendant counterclaimed against numerous individual class members to protect its rights, class certification denied); *Plekowski v. Ralston Purina Co.,* 68 F.R.D. 443, 452 (M.D. Ga. 1975)("the existence of counterclaims multiplies further the individual issues"); *Chmieleski v. City Products Corp.*, 71 F.R.D. 118, 174-76 (W.D. Mo. 1976) (denying, in part, class certification to certain tie-in claims raised by franchisees in an antitrust class action, and holding that the existence of substantial individual issues of fact which would require the production of a large volume of evidence rendered these

claims unmanageable because the issues could not be determined with evidence applicable to the class as a whole).

Finally, Plaintiffs have not carried their burden of demonstrating that Rule 23's purposes of efficiency and judicial economy would be served better by certifying the suggested class(es) rather than by permitting franchisees to litigate their claims individually.  Plaintiffs offer no support for their prediction that denying certification would necessarily lead to "more than three thousand separate trials."  (Class Cert. at 36.)  Such baseless speculation cannot withstand the rigorous analysis the court must bring to the superiority determination.  Moreover, as courts frequently recognize, individual action would inure to the benefit of all class members on specific issues under the doctrine of collateral estoppel.  *See, e.g.*, *J.M. Woodhull, Inc. v. Addressograph-Multigraph Corp.*, 62 F.R.D. 58, 61 (S.D. Ohio 1974).  Because Plaintiffs have failed to demonstrate that a class action is a superior method for adjudicating their claims, their motion for certification should be denied.

### 4.    PLAINTIFFS FAIL TO MEET THE TYPICALITY REQUIREMENTS OF RULE 23(a)(3).

The typicality requirement of Rule 23(a)(3) mandates that the named Plaintiffs' claims not only share a common question of law or fact with the class, but that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality thus "focuses on the characteristics of the class representative(s)."  *Wilkerson v. Martin Marietta Corp.*, 875 F. Supp. 1456, 1462 (D. Colo. 1995).  As the District Court of Colorado has noted, "Rule 23(a)(3) may be used to screen out class actions when the legal or factual positions of the

representatives is markedly different than that of other members of the class."[41]  *City*

*P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 583 (D. Colo. 2002).  While the

claims of the named Plaintiffs need not be factually identical to those of the entire class,

there is no typicality when "the factual circumstances of each member of the class

would have to be considered separately."  *Morris v. Travelers Indem. Co. of America*,

No. 05-CV-727, 2006 WL 166597, at *9 (D. Colo. Jan 19, 2006) (citing *Broussard*, 155

F.3d at 342).  Put differently, the claims of the class representatives and class members

must be based on the same legal or remedial theory, *Adamson v. Bowen*, 855 F.2d 668,

676 (10th Cir. 1988), and certification is "inappropriate where a putative class

representative is subject to unique defenses which threaten to become the focus of

litigation."  *City P'ship*, 213 F.R.D. at 586 (quotation omitted).

　　　　For reasons similar to the predominance analysis, Plaintiffs' generic statement

that typicality is satisfied because their claims generally arise from the same "operative

facts" and they will pursue the same claims and relief oversimplifies and falls short of

the typicality requirement.  (Class Cert. at 23.)  To the contrary, all of the named

Plaintiffs' claims—including the CCPA, fraud, contract and equitable claims--are *not*

typical because they are based on *individualized* alleged representations or omissions

by Quiznos that are specific to the named plaintiffs.  These statements and the factual

circumstances within which they occurred and which form the basis for the alleged

---

[41] Some courts use this factual circumstance analysis to deny certification under the commonality requirement of Rule 23(a)(2).  *See Morris v. Travelers Indem. Co. of America*, No. 05-CV-727, 2006 WL 166597, at *9 (D. Colo. Jan 19, 2006).  Regardless of the label, the fundamental problem here is that the individual factual circumstances surrounding the alleged varied and different statements and representations by Quiznos that form the basis for *all* of the named plaintiffs' *individual* claims defeat certification, whether characterized as a typicality or commonality issue.

deceptive conduct under the CCPA, the alleged misrepresentations or omissions for fraud, the alleged contractual obligations, the alleged unjust enrichment to Quiznos and the releases allegedly procured by duress, *differ* among the named plaintiffs and between them and the members of the class.  Thus, their claims are not typical.

Class certification is also inappropriate where the named Plaintiffs are subject to even an arguably unique defense.  *City P'ship*, 213 F.R.D. at 583 (quotation omitted). Several of the named Plaintiffs negotiated a release as part of an agreement to terminate their franchise agreement or extend the time to open a store beyond 12 months.  Quiznos' defense to *all* claims brought by these named Plaintiffs is that they are barred by the releases each negotiated.  Plaintiffs take the position that such releases should be invalidated because they were allegedly obtained under duress.  At a minimum, this will require Plaintiffs to prove the specific circumstances under which each signed the release and the actions taken by Quiznos regarding the same, making the claims of these named Plaintiffs not "typical" of the class members who did not sign a release.

In addition, some or all of the Plaintiffs and some of the members of the purported classes' claims are barred by the contractual and statute of limitations.  For example, Plaintiffs Rich Varrato and Andrzej Sliwowski both consulted counsel about their potential claims against Quiznos over *two years* before being added as named Plaintiffs in this action.  (Thomas Zepf Decl. at 1, ¶2, Nov. 11, 2008 (consulted by R. Varrato in May, 2005); J. Wolfson Decl. at 1, ¶2, November 14, 2008 (consulted by A. Sliwowski in September, 2005).)  Their claims are barred by the one year contractual

limitations period in the franchise agreement.  (App. 000039, Franchise Agreement §

21.4 ("[A]ny claims between the parties must be commenced within one (1) year from

the date on which the party asserting the claim knew or should have known of the facts

giving rise to the claim, or such claim shall be barred.")  Depending on the timing and

circumstances, many others' claims are likewise barred.  While courts have certified

classes with varied limitations periods before, *e.g.*, *Cook v. Rockwell Int'l Corp.*, 151

F.R.D. 378, 386 (D. Colo. 1993), this demonstrates yet another individual class-wide

analysis the court will need to undertake during litigation, despite the purported typicality

of the representative Plaintiffs.  The named Plaintiffs also signed their franchise

agreements at different times, and the application of the contractual limitations period

will be unique to each plaintiff.[42]

### 5.    NO INJUNCTION CLASS SHOULD BE CERTIFIED UNDER Fed. R. Civ. P. 23(b)(2)

Plaintiffs ask for certification of a third class, made up of those who opt-out of

Class 2, assuming such a class is certified.  (Class Cert at 47-48.)  Assuming they opt

in, *none* of the named Plaintiffs are adequate representatives of this *third* class of

franchisees to seek relief in the form of an injunction that would bar Quiznos from

---

[42] Further, the statute of limitations period may have began to run earlier than one year after the franchise agreement was signed if the Plaintiffs or the putative class members "knew or should have known through the exercise of reasonable diligence that [they] had been injured by a wrongful act." *Gallagher v. Board of Trustees for University of Northern Colorado*, 54 P.3d 386, 391 (Colo. 2002*); see also Grant v. Pharmacia & Upjohn Co.*, 314 F.3d 488, 493 (10th Cir. 2002).  If such is true (or if Plaintiffs attempt to overcome the limitations period by arguing that they discovered the claims later than one year after they signed their franchise agreements), it adds yet another individualized determination that the Court must make in order to determine whether the named Plaintiffs or the putative class members are barred by the applicable limitations period.  *See Doll v. Chicago Title Ins. Co.*, 246 F.R.D. 683, 687 (D. Kan. 2007) (agreeing with "those courts that have denied class certification in . . . cases requiring application of the discovery rule to overcome a limitations defense).

attempting to enforce its rights under the franchise agreement and negotiate a resolution of any claims.  "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *General Tele. Co. v. Falcon*, 457 U.S. 147, 157 (1982); *see also Monarch Asphalt Sales Co. v. Wilshire Oil Co. of Tx.*, 511 F.2d 1073, 1077 (10th Cir. 1975) ("[A] class action may not be maintained by a putative representative who is not a member of the class.").  It is logically impossible for any plaintiff currently involved in the litigation to be part of a class of those who have *opted-out* of the litigation.  Additionally, under even the most cursory Rule 23(a) analysis, it is clear the named Plaintiffs focused on a damage suit are not typical of and will not adequately protect the interests of those not seeking damages but rather seeking to remain franchisees and open a store.  *See Rathbun v. Qwest Communications Int'l, Inc.*, 458 F. Supp. 2d 1238, 1247 (D. Colo. 2006) (conflict of interest prevented adequate class representation); *see also Broussard*, 155 F.3d at 339 (damage-seeking Plaintiffs could not adequately represent those who had released defendant from liability).  Plaintiffs blindly overreach their authority in outlining a class, which they do not represent and which does not satisfy the Rule 23 requirements.

Further, this attempt at an "injunctive class" would compel franchisees committed to building a mutually beneficial relationship with Quiznos to become party to a lawsuit they had refuted and would limit said franchisees ability to negotiate modifications of their Franchise Agreements.  Such a result is untenable and completely outside the purpose and scope of the class certification process.  Plaintiffs' motion to certify such a class should be denied.

# IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be

denied.

Dated this 1st day of December 2008.

s/ Leonard H. MacPhee
Leonard H. MacPhee
Michael A. Sink
Attorneys for Defendants
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Telephone:  (303) 291-2300
Facsimile:  (303) 291-2400
Email:  lmacphee@perkinscoie.com

and

Fredric A. Cohen
Andrew P. Bleiman
Cheng Cohen LLC
1101 W. Fulton Market, Suite 200
Chicago, Illinois 60607
Telephone: (312) 243-1701
Fax: (312) 243-1721
Email:    fredric.cohen@chengcohen.com
          andrew.bleiman@chengcohen.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2008 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

**Kristin M. Bronson**
kbronson@rothgerber.com,jmartinez@rothgerber.com
**Russell Scott Burnside**
rburnside@greenbergdauber.com,litigationgroup@greenbergdauber.com
**Joseph S. Goode**
jsg@kravitlaw.com,reception@kravitlaw.com,dmh@kravitlaw.com,lag@kravitlaw.com
**John Aaron Hughes**
john.hughes@dlapiper.com
**William Frederick Jones**
billy.jones@moyewhite.com,mary.davis@moyewhite.com
**Justin M. Klein**
justin@marksklein.com,joanne@marksklein.com,david@marksklein.com,
karin@marksklein.com
**Mark M. Leitner**
mml@kravitlaw.com,reception@kravitlaw.com,dmh@kravitlaw.com,lag@kravitlaw.com
**David S. Paris**
david@marksklein.com,karin@marksklein.com
**Michael D. Plachy**
mplachy@rothgerber.com,ccollins@rothgerber.com
**Ross H. Schmierer**
ross@marksklein.com,karin@marksklein.com

_s/ Leonard H. MacPhee_
Leonard H. MacPhee
Attorney for Defendants
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Telephone:  (303) 291-2300
Facsimile:  (303) 291-2400
Email:  lmacphee@perkinscoie.com