**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 06-cv-02358-CMA-KLM

RAYMOND BONANNO,
ANTHONY BONANNO,
ROBERT PETER,
RAJAN DESAI,
NISHA DESAI,
ELISA WHITEHALL,
DAJIT PARMAR,
MANJIT PARMAR,
IRVING BROTHMAN,
JOANNE KJOLSEN,
KRISTI LEWIS.
MEGAN MAKKI,
MUKAND MALHI,
PREETINDER MALHI,
ALI NAQBI,
ANDRZEJ SLIWOWSKI,
RICHARD VARRADO, and
BARTON CLATT,

      Plaintiffs,

v.

THE QUIZNO'S FRANCHISE COMPANY, LLC,
QUIZNO'S FRANCHISING, LLC,
QUIZNO'S FRANCHISING II, LLC,
QFA ROYALTIES, LLC.,
RICHARD E. SCHADEN,
RICHARD F. SCHADEN, and
TQCS LLC,

      Defendants.

---

**ORDER DENYING MOTION FOR CLASS CERTIFICATION**

This matter is before the Court on Plaintiffs' Motion for Class Certification.  (Doc. # 212).  For the following reasons, the Motion is DENIED.

## INTRODUCTION

This is a franchise dispute.  Plaintiffs claim that defendants (referred to collectively as "Quiznos") misled prospective franchisees with sparkling promises of exclusive restaurant market areas and expert assistance to help them locate real estate for their restaurants.  Plaintiffs allege that after they signed the thirty-plus-page franchise agreement, Quiznos revealed that the market areas were not as profitable as Quiznos had promised.  Further, Quiznos left Plaintiffs without any of the promised expert help.  Despite allegedly leaving Plaintiffs in the lurch, Quiznos still required Plaintiffs to open a restaurant within the one-year deadline required by the franchise agreement.  If a franchisee failed to open his or her restaurant, as often happened, Quiznos would terminate the franchise agreement or otherwise alienate the franchisee from the organization and keep the franchise fee.

Plaintiffs filed this suit on behalf of themselves and two classes of these "sold-but-not-opened-franchisees" ("SNOs").  The first class is comprised a group of SNOs that Quiznos has elected to terminate for failing to open their restaurant within one year of signing the franchise agreement.  The second class is generally comprised of a

2

smaller group of SNOs that also failed to open a restaurant, but that Quiznos has

elected not to terminate.  Pursuant to Federal Rule 23, Plaintiffs seek to certify these

two classes for resolution of their claims.

Quiznos opposes class certification and generally denies that its sales pitch

misled franchisees about the franchise requirements.  Relying on a class action bar

contained in the relevant franchise agreement, Quiznos contends that Plaintiffs agreed

not to proceed as a class.[1]  Section 21.4 of the franchise agreement states in part:

> The parties agree that any proceeding will be conducted on an individual,
> not a class-wide, basis, and that any proceeding between Franchisor and
> Franchisee or the Bound Parties may not be consolidated with another
> proceeding between Franchisor and any other entity or person.

Quiznos argues that this provision is enforceable and precludes class certification.

Alternatively, Quiznos argues that Plaintiffs cannot satisfy the elements of class

certification under Federal Rule 23.

Given the class action bar provision, Plaintiffs' Motion nicely frames the question

this Court must answer in deciding the Motion for Class Certification:  "The most

significant issue . . . is whether, in light of the provision of the franchise agreements that

purports to bar class actions, this case can be maintained as a class action in the first

instance."  To answer this question, the Court held a hearing specifically on the issue of

---

[1]   Plaintiffs refer to the clause as a "waiver," but the Court believes that it is more
properly labeled a class action "bar" because, as shown below, Plaintiffs do not have
a substantive right to proceed as a class, and, therefore, have not really "waived" anything.

the enforceability of the class action bar and invited supplemental briefing on the issue.

On the basis of the facts and argument developed during the hearing and in the various

briefs and supplements, the Court answers Plaintiffs' question in the negative, this case

cannot be maintained as a class action.

## BACKGROUND

### I.    FACTS

A detailed description of the facts will help elucidate the Court's decision to

enforce the class action bar.

### A.    A Brief History of Quiznos and the SNOs

Quiznos sells submarine sandwiches at franchised restaurants across the

country and internationally.  The chain started with a single restaurant in Denver in 1981

and soon began to franchise itself.  (Doc. # 259 at 3.)  In 1991, Defendant Schaden and

his father purchased the entire operation, which consisted of 18 restaurants.  (*Id.*)  The

company grew rapidly, and by the end of the millennium, Quiznos had opened over

1,100 restaurants.  (*Id.*)  That growth continues through today:  at the time Quiznos filed

its Response to Plaintiff's Motion for Class Certification, it had over 4,440 restaurants in

the United States and an additional 600 stores in twenty-three foreign countries.  (*Id.*)

However, as this lawsuit makes clear, not every signed franchise agreement

results in a functioning restaurant.  In fact, Plaintiffs allege that more than 3,200

so-called SNOs exist in the Quiznos system.  In most instances, Quiznos terminates the

4

franchise agreement if a franchisee fails to open a restaurant within the one-year deadline.  However, Quiznos does not terminate all of the SNOs that fail to open.  In many other instances, Quiznos has pledged to continue working with the SNOs to open a restaurant.  Around the same time that Plaintiffs filed this lawsuit, Quiznos began to recognize that the SNO backlog presented a business problem and, potentially, a legal problem.  Thus, as the number of SNOs continued to grow, Quiznos reorganized itself to change the way it sold franchises and to "instill some integrity into the development process."  (Doc. # 235 at 8.)

     B.    <u>Plaintiffs' Theory of Fraud and the Franchise Sales Pitch</u>

Plaintiffs' theory is essentially that Quiznos operated a type of quasi-Ponzi scheme by fraudulently selling franchises, accepting the franchise fee, terminating the franchise when the franchisee could not open a restaurant within the deadline because Quiznos failed to assist the franchisee, and then re-selling the same franchise.

     1.    *Quiznos' Alleged Misrepresentations Regarding Franchise Ownership*

Plaintiffs highlight Quiznos' overhaul of the SNO system as evidence that Quiznos knew of a problem.  They also attempt to spin Quiznos' growth in their favor. (Doc. # 89, ¶¶ 25, 26.)  According to Plaintiffs, Quiznos developed its franchise sales "script" with the goal of simply selling as many franchises (Plaintiffs call them "pieces of paper") as possible, without regard for whether a franchisee ever opened a restaurant

or whether a restaurant would ever turn a profit.  (*See, e.g.,* Doc. # 235 at 6-7; Doc. # 299 at 3.)

Plaintiffs' allegations focus on Quiznos' dealings with prospective franchisees on the topics of "target areas"[2] and restaurant location assistance and approval. Plaintiffs claim that Quiznos routinely inflated the economic potential of particular targets areas, even though Quiznos knew that the areas had little or no likelihood of sustaining a viable restaurant.  (Doc. # 89 ¶¶ 34-36.)  When a target area proved unworkable for a franchisee (sometimes because of Quiznos' refusal to approve a restaurant site), Quiznos terminated the franchise, kept the franchise fee, and resold the target area to a new franchisee.  (*Id.*)  Plaintiffs also claim that Quiznos promoted target areas as being "exclusive" (*i.e.*, limited to one franchisee) even though those "exclusive" target areas already contained another Quiznos franchise.  (*Id.*)

As this lawsuit has progressed, Plaintiffs have moved away from their target area allegations and focused more on their claim that Quiznos made misrepresentations regarding real estate assistance.[3]  Plaintiffs allege that Quiznos promised that it would assist franchisees in locating and securing real estate for their new restaurants.  (*Id.*

---

[2]   A "target area" is Quiznos' slang for a franchisee's particular geographic area of responsibility.

[3]   This lawsuit is not the first time Quiznos has dealt with this type of allegation in court. *See, e.g., RHC, LLC v. Quizno's Franchising, LLC*, No. 04CV985, 2005 WL 1799536 (Dist. Ct., City and County of Denver July 19, 2005) (lawsuit by former Quiznos franchisee against Quiznos for failure to provide real estate assistance).

6

¶ 41; Doc. # 235 at 8-9.)  Plaintiffs allege that Quiznos touted its "real estate experts"
and that potential franchisees could expect hands-on assistance with real estate and
business matters after signing onto the Quiznos team.  (Doc. # 235 at 9.)  But, Plaintiffs
allege, after the franchisee had signed the agreement and committed to opening a
restaurant, Quiznos provided none of the expert assistance it previously pledged to
provide.  (*Id.* at 12-13)  Plaintiffs further contend that any "assistance" Quiznos provided
actually impeded the franchisee's ability to open a restaurant on time.  For example,
Plaintiffs claim that Quiznos directed franchisees to unworkable restaurant sites and
unreasonably denied corporate approval of sites based on constantly changing approval
criteria.  (*Id.*)  Plaintiffs allege that Quiznos' goal was simply to sabotage the
franchisee's ability to open a restaurant on time.  (*Id.*)  The crux in Plaintiffs' theory is
that while Quiznos trumpeted these allegedly non-existent benefits of franchise
ownership to potential franchisees, Quiznos also concealed the growing list of SNOs
and the restrictive one-year deadline during which the franchisees had to open their
restaurants.  (Doc. # 89 ¶ 42; Doc. # 235 at 10-11.)

2.      *Quiznos' Franchise Sales Script*

To support their Motion for Class Certification, Plaintiffs provide declarations from
the named Plaintiffs and various Quiznos documents produced in discovery.[4]  The

---

[4]   Plaintiffs also requested an evidentiary hearing, but to their credit, between Plaintiffs'
personal declarations and the Quiznos documents, Plaintiffs describe the Quiznos franchise
sales program with reasonable particularity.

record discloses that Quiznos' franchise marketing followed a fairly uniform "script"[5] around the country.  (Doc. # 235 at 4-5.)  Indeed, the common theme in Quiznos' franchise marketing was the chain's rapid growth and high rankings among various trade groups and publications.

Plaintiffs discovered Quiznos through various channels.  Multiple named Plaintiffs describe how they initially learned about Quiznos on the internet.  Potential franchisees could also learn about franchise opportunities from direct mailings and newspaper advertisements.  But, this being the internet age, even Quiznos' printed materials directed interested parties to check out Quiznos' website for more information.  The materials invited potential franchisees to visit Quiznos' website with snazzy phrases like, "If you love our subs, try a whole store!"  (*See, e.g.,* Doc. # 218, Ex. B at Bates No. Q-REF 006694.)  Some of Quiznos' direct mailings even promoted franchise sales with a sweepstakes to "Win a Franchise Fee!" by attending a Quiznos' sales seminar.  (Doc. # 218, Ex. B at Bates No. Q-REF 006672.)

The printed materials provided very little substantive information regarding franchise ownership.  Thus, Plaintiffs claim that they relied largely on Quiznos' website for franchisee information after learning about Quiznos from other sources.  Plaintiffs submit internet screen-shots of Quiznos' website.  The screen-shots disclose a basic

---

[5]  At various points in their briefing, Plaintiffs resort to rhetorical and inflammatory language to describe Quiznos' sales practices, *e.g.*, "charade," "dupe," calling Quiznos personnel "hucksters," etc.  These discretions from legal civility do not help Plaintiffs' case and the Court encourages counsel to pause a moment before resorting to the computer thesaurus tool when writing their briefs.

financial survey that, when completed, will answer the question everybody wants to know, "Are you ready for the toasty taste of success?"  (*See, e.g.,* Doc. # 218, Ex. A at Bates No. Q-REF 006996.)  The survey first probes prospective franchisees with questions about their net worth (greater than $125,000?) and liquid cash assets (greater than $70,000?).  (*Id.*)  It then moves on to rather generic personality-type questions, *e.g.,* "Do you usually, finish what you start [or s]tart more projects than you complete?" and "Do you [a]void situations involving risk [or f]eel reasonably comfortable with risk?" (*Id.*)  The survey then returns to the money issue, asking about a prospective franchisee's liquid assets and total net worth with more specific questions, (*id.* at Bates No. Q-REF 007000-01.)  including other financial and legal issues like prior bankruptcy and non-competition agreements.

Plaintiffs point out that the screen-shots boast that "Quiznos has a proven economic model which has brought more than 3000 stores worldwide into business" and that Quiznos offers "[o]ngoing local support once your store is open."  (*Id.* at Bates No. Q-REF 007008.)  Notably, Quiznos' website also indicated that Quiznos has "an experienced real estate team who will help you with site selection and lease negotiation" and that it will take "[a]pproximately 4 months from securing a site" to open a restaurant. (*Id.* at Bates No. Q-REF 007009.)  Quiznos' website also stated that franchisees would find a restaurant location by "[w]orking with [Quiznos'] network of brokers" who would "help [franchisees] select a location within Quiznos Sub stringent site criteria."  (*Id.*) However, like the printed advertising materials, the screen-shots submitted by Plaintiffs

contain very little substantive information regarding the franchise agreement or franchisee duties.

In addition to written materials and the internet, Quiznos put on live shows, or "open houses" to sell restaurants.  The open houses typically took place in local hotels or conference centers and apparently focused on coordinated Power Point presentations given by trained Quiznos sales representatives.  (Doc. # 232.)  To provide a behind-the-scenes view of the open houses, Plaintiffs submit a declaration from a former Quiznos sales person, Dave Sharma, whom Quiznos allegedly fired for failing to meet his sales goals.  (Doc. # 217.)  Mr. Sharma declares that Quiznos required presenters like himself to attend sales training in Denver and that Quiznos' corporate office provided all of the materials used during the seminars.  (*Id.* ¶ 14.)  According to Mr. Sharma, Quiznos' open houses informed prospective franchisees that Quiznos would help them with real estate matters at each step of the sales process.  (*Id.*)  He also stated that Quiznos used printed advertisements and materials at the open houses to promote franchise sales.  (*Id.* ¶¶ 12-14.)

3. *The Plaintiffs' Experiences*

Each named Plaintiff purchased the right to open a Quiznos franchise in 2003 or 2004, but none of them opened a restaurant.  (*See, e.g.,* Doc. # 89, ¶¶ 3-13.)  Some Plaintiffs have had their franchise agreements terminated, others have signed release agreements, and others remain as SNOs within the Quiznos system.  Their stories demonstrate how Quiznos put its multifaceted marketing campaign to work.  Although

mailings, internet research, and seminars often began the franchisee sales process, in

each case, a prospective franchisee met with a Quiznos representative face-to-face

before signing a franchise agreement.  Plaintiffs allege that these representatives simply

parroted Quiznos' misleading marketing materials.  Notably, Plaintiffs allege that

Quiznos' representatives told them that Quiznos would provide expert assistance

in locating real estate and opening the store.  But, when it came time to sign the

franchise agreement, instead of providing assistance or answering questions,

the Quiznos representative would sit them down and quickly and forcefully guide

them through the thirty-plus page contract and addendums.  Plaintiffs claim the

representatives simply told them where to sign and deflected any questions regarding

the terms of the agreement.

For example, Plaintiff Anthony Bonanno went to Quiznos' website, filled out the

financial survey application and began to receive mailings from Quiznos inviting him to

attend an open house.  (Doc. # 214 ¶ 2.)  In response to the mailings, Plaintiff Anthony

Bonanno's father, Plaintiff Raymond Bonanno, attended an open house at a local hotel.

The older Bonanno must have liked the presentation because the younger Bonanno

then set up a face-to-face meeting with a Quiznos representative who had presented at

the open house.  (*Id.* ¶ 6.)  The Bonannos allege that the Quiznos representative then

pressured them into purchasing a particular target area by saying that all of the good

areas would be sold quickly.  (*Id.*)

Like the Bonannos, Plaintiff Sliwowski also met with a Quiznos representative, this time at a Quiznos store in Connecticut.  (Doc. # 213 ¶ 4.)  He alleges that the Quiznos representative pressured him into purchasing a franchise by telling him that all of the good locations were "going fast."  (*Id.*)  Plaintiff Klatt[6] learned about a Quiznos open house from advertisements in the local paper.  (Doc. # 215 ¶ 2.)  At the time he first learned about Quiznos, Plaintiff Klatt lived in Washington state but wanted to move back to California.  He states that Quiznos representatives encouraged him to move by promoting target areas in and around San Diego.[7]  (*Id.* ¶¶ 5-6.)

Regardless of how they learned about Quiznos, Plaintiffs never opened a restaurant.[8]  Some named Plaintiffs sought legal advice regarding the return of their franchise fee, but claim to have been repelled by the cost of individual case litigation. Interestingly, given that this is a Motion for Class Certification, Plaintiffs never specifically address how the class action bar or any other term of the Franchise Contract relating to dispute resolution played into Quiznos' allegedly deceptive scheme.

---

[6]  In his declaration, Plaintiff Klatt's last name is spelled "Klatt."  (Doc. # 152.) However, the case caption refers to Plaintiff "Clatt."  The Court assumes this the same person and will refer to Plaintiff Klatt as his named is spelled in his declaration.

[7]  Plaintiffs have submitted numerous additional descriptions of how they came to sign a Quiznos franchise agreement, but none of them differ in any meaningful way from the Bonannos, Mr. Sliwowski or Mr. Klatt's experience – each allege that Quiznos pressured them into purchasing a franchise without properly explaining the duties that accompanied franchise ownership or the one-year deadline.  (*See, e.g.,* Docs. # 223, 224, 225 & 226.)

[8]  Quiznos argues that failure of Plaintiffs to open a restaurant was not a result of any fraud, but because Plaintiffs failed to propose suitable restaurant sites pursuant to the terms of the franchise agreement or, as in the case of Plaintiff Whitehall, they failed to propose any site at all.  (Doc. # 259 at 14.)

Nor do Plaintiffs mention any efforts by Quiznos representatives to discuss and explain, on one hand, or hide or conceal, on the other, the class action bar provision or any other particular provision in Section 21.4.

    C.    <u>Quiznos' Side of the Story:  The Uniform Franchise Offering Circular and the Franchise Agreement Terms</u>

Quiznos concedes that it used a number of channels to sell its franchises, including the internet, print media, radio and television, and live seminars.  (Doc. # 259 at 5.)  Quiznos states that it has taken "great care" to ensure that its marketing materials provide the correct information regarding its franchises and that the materials conform with the terms of the franchise agreement.  Quiznos also states that the degree of assistance Quiznos provided to named Plaintiffs varied, but that it provided such assistance in a manner consistent with the marketing materials and represen-tations made by its sales people.  Quiznos also points out that it was required by law to provide a Uniform Franchise Offering Circular (now known as the "Uniform Franchise Disclosure Document," and referred to herein as "UFOC") to each franchisee and that the marketing materials conform to the UFOC.  (*Id.* at 6.)

Quiznos contends that, although the marketing materials are accurate, the UFOC and franchise agreement clearly set forth the rights and obligations of the franchisees and the one-year deadline.  Quiznos points out that the UFOC states in all capital, bold letters that:

        WE MAY TERMINATE YOUR FRANCHISE AGREEMENT IF YOU DO
        NOT OPEN YOUR RESTAURANT WITHIN 12 MONTHS AFTER YOU

> SIGN THE FRANCHISE AGREEMENT. THE FRANCHISE FEE IS
> NONREFUNDABLE.

(*Id.* at 8.)  Additionally, Quiznos argues that the UFOC makes clear that it is the

franchisee's obligation to "propose the location" for Quiznos' approval.  Furthermore,

Quiznos asserts that, in UFOCs used since 2001, it has disclosed the number of

purchased franchises that failed to open a restaurant, *i.e.*, the number of SNOs.  (*Id.* at

7-8.)  Notably, Plaintiffs do not deny that Quiznos provided them with the UFOCs at

least ten days prior to their signing of their respective franchise agreements, although

they argue that they did not necessarily read them.

Quiznos also identifies a number of terms in the franchise agreement that it

believes refutes Plaintiffs' claims.  These terms often mimic the disclosures in the

UFOC, *e.g.,* Franchise Agreement § 3.1 states, "Franchisee shall choose and acquire

a location for its Restaurant within the nonexclusive Target Area set for in Exhibit 1;"

§ 9.1(a) states, "Franchisee acknowledges that Franchisor has no obligation to select

or acquire a site on behalf of Franchisee;" and § 23.2 states, "Franchisee further

acknowledges and agrees that no representations have been made to it by Franchisor

or its affiliates regarding projected sales volumes, market potential, revenues, profits of

Franchisee's Restaurant, or operational assistance provided by Franchisor or its

representatives."  (Doc. # 259 at 10.)  The franchise agreements also contain a choice

of law and choice of venue clause that mandates the application of Colorado law and

requires a franchisee to file a claim in Colorado, either in the District Court for the City

and County of Denver or this Court.  (*See* Doc. # 1-4 § 21.1.)

14

In essence, Quiznos does not seriously refute the facts alleged by Plaintiff, but instead challenges the conclusions that Plaintiffs reach regarding the franchise sales script.  Quiznos contends that Plaintiffs' fraud theory defies logic and business sense because Quiznos and its representatives had a financial incentive, in the form of sales royalties and bonuses, to open the restaurants they sold.

However, despite all of the parties' factual allegations and arguments on the merits of the case, the critical issue before the Court is the enforceability of Section 21.4, which contains the class action bar.

## II.   PROCEDURAL HISTORY

Turning now to the history of this case, Plaintiffs originally filed suit in New Jersey state court in February 2006.  (Doc. # 1-2.)  In March 2006, Quiznos removed the case to the U.S. District Court for the District of New Jersey pursuant to the Class Action Fairness Act.  (*See* Doc. # 1-1.)  Quiznos then quickly moved to dismiss the case based on the venue selection clause in the franchise agreement.[9]  However, instead

---

[9]   Plaintiffs made similar arguments against enforcement of the venue selection clause that they make here against enforcement of the class action bar.  However, Judge Cavanaugh rejected each of Plaintiffs' arguments.  First, he found that Quiznos had not fraudulently induced Plaintiffs into agreeing to the venue selection clause.  (Doc. # 23 at 5-6.)  He held that to avoid application of the clause Plaintiffs must show that the venue selection clause itself, as opposed to the entire contract, had been fraudulently induced and Plaintiffs failed to meet that burden.  (*Id.*)  Judge Cavanaugh further rejected Plaintiffs' contention that the unequal bargaining power between Quiznos and prospective franchisees rendered the venue selection clause unenforceable.  (*Id.* at 6-7.)  Judge Cavanaugh also rejected Plaintiffs' claim that the franchise agreement was unreasonable or unconscionable because Quiznos presented it on a "take-it-or-leave-it" basis.  (*Id.* at 9-10.)

of dismissing the case, the District Court in New Jersey transferred the matter to this Court pursuant to 28 U.S.C. § 1404(a).  (Doc. # 24.)

This Court received the case in December 2006, at which time Quiznos filed a motion to dismiss pursuant to Federal Rule 12(b)(6).  (Doc. # 41.)  Before the Court could rule on that motion, Plaintiffs amended their Complaint.  (Doc. # 89.)  In August 2007, Quiznos filed a second Rule 12(b)(6) motion to dismiss (Doc. # 103), which the Court denied.  (Doc. # 174.)  Because the parties had agreed to attempt mediation, Quiznos sought numerous extensions of time to respond to the Amended Complaint. When mediation proved unsuccessful, the parties proceeded with discovery.  Quiznos eventually filed an answer to the amended complaint and a counterclaim, which Plaintiffs have moved to dismiss.  (Doc. ## 229 and 249.)  Quiznos amended the counterclaim in November 2008.[10]  (Doc. # 255.)

On the issue of class certification, Plaintiffs first moved for class certification in January 2008.  (Doc. # 140.)  The Court denied that motion as premature, but indicated that Plaintiffs could re-file after they had completed discovery.  (Doc. # 197.)  In September 2008, Plaintiffs re-filed their Motion for Class Certification (Doc. # 212) and requested a hearing on the issue.  (Doc. # 282.)  The Court granted the request for a hearing, which it scheduled for April 23-24, 2009, but it also held oral argument on the distinct issue of the enforceability of class action bar on March 2, 2009.  The Court

---

[10]   The Counterclaim pleads a breach of contract claim against Plaintiffs for failing to open their restaurants within one-year.  (Doc. # 255.)

invited the parties to submit supplemental briefing solely on the class action bar issue, and both parties have submitted such briefing.  (Doc. ## 299 and 301.)[11]

## III.    STANDARD OF REVIEW

Typically, named parties conduct litigation on behalf of themselves; a class action is an exception to this rule.  *See General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 155 (1982) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)).  Federal Rule 23 governs class certification and district courts have discretion to certify or deny certification of a class.  *Shook v. El Paso County*, 386 F.3d 963, 968 (10th Cir. 2004); *Paton v. New Mexico Highlands Univ.*, 275 F.3d 1274, 1278 (10th Cir. 2002).  In order to certify a class, the class proponent must clearly satisfy four prerequisites contained in Rule 23(a):

> (1)  the class is so numerous that joinder of all members is impracticable;
> (2)  there are questions of law or fact common to the class;
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Shook*, 386 F.3d at 968 (noting that district court should perform "rigorous analysis of whether the prerequisites of Rule 23(a) have been satisfied") (internal quotations and citations omitted); *Clark v. State Farm Mut. Auto. Ins. Co.*, 245 F.R.D. 478, 481 (D. Colo. 2007) (noting the "strict burden of proof" under Rule 23(a)).

---

[11]    The parties have filed other motions since the Motion for Class Certification, including Plaintiffs' Motion for a Protective Order to Enjoin Improper Communications with the Putative Class (Doc. # 268), Plaintiffs' Motion for Rule 11 Sanctions (Doc. # 270), and, most recently, Quiznos' Motion for Summary Judgment.  (Doc. # 312.)  The Court will address the other outstanding motions in separate orders.

Only if the class proponent can satisfy the prerequisites of Rule 23(a), does the court need to determine if the matter falls within one of the categories identified in Rule 23(b).  *See* Fed. R. Civ. P. 23(b) ("A class action may be maintained if Rule 23(a) is satisfied); *see also* Moore's Federal Practice § 23.40[1] (3d. ed. 2007).  Courts have held that the same rigorous analysis under Rule 23(a) also applies under the Rule 23(b) categories.  *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 33 n.3 (2d Cir. 2006).

In ruling on class certification, district courts should not delve deeply into the merits of the parties' claims or defenses.  *See J.B. v. Valdez*, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999) ("We recognize that, when deciding a motion for class certification, the district court should accept the allegations contained in the complaint as true."); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 380-81 (D. Colo. 1993) (noting that inquiry into the merits  is "inappropriate" when determining whether action meets the requirements of Rule 23).  Thus, courts should analyze whether the class proponent has met its burden based on the substantive allegations in the complaint and evidence submitted along with the motion for class certification.

Courts disagree on whether they should interpret Rule 23 liberally or strictly.  *See* Moore's Federal Practice § 23.03 (3d ed. 2007) (arguing for "flexible approach" to Rule 23); *see also Roby v. St. Louis S.W. Ry. Co.*, 775 F.2d 959, 961 (8th Cir. 1985) (noting

that Rule 23 should be strictly applied).  However, the Tenth Circuit Court of Appeals falls into the liberal interpretation camp and has held that courts in this Circuit should err in favor of certifying a class.  *See Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968) ("any error, if there is to be one, should be committed in favor of allowing the class action"); *see also Clark*, 245 F.R.D. at 481 ("where the case is close, I will err in favor of allowing maintenance of the class action").

While the Court is cognizant of this standard of review, as discussed below, this standard is only tangentially relevant to the Court's analysis because the real issue at this point is not whether Plaintiffs can comply with Rule 23, but whether the Court should enforce the class action bar.

## DISCUSSION AND ANALYSIS

As Plaintiffs note in their Motion, the "most significant issue" at this point is whether this Court should enforce the class action bar in the franchise agreements. Plaintiffs argue that the class action bar is unenforceable because (1) it is unconscionable, and (2) Quiznos cannot demonstrate the Plaintiffs knowingly and voluntarily "waived" their "right" to proceed as a class.  Quiznos responds that Plaintiffs cannot prove that the bar is unconscionable and that, like any "right," Plaintiffs can "waive" their "right" to proceed as a class.  Alternatively, Quiznos argues that Plaintiffs cannot satisfy Rule 23.  The Court need not address the merits under Rule 23 because it finds the class action bar enforceable and, therefore, it concludes that the franchise agreement precludes class certification in this matter.

The Court first discusses the history and evolution of class action litigation, which leads the Court to conclude that Plaintiffs can preclude themselves from proceeding as a class.  After that, the Court discusses which party bears the burden to show that the class action bar is enforceable or unenforceable, as the case may be.  The Court then reviews previous treatment of class action bars and/or waivers.  Finding little guidance in the case law treatment of class action bars, the Court turns to an analysis of the class action bar under the law of unconscionability in Colorado.  Finally, the Court will briefly address its own jurisdictional and prudential concerns regarding enforcement of the class action bar.

IV.     THE HISTORY AND EVOLUTION OF CLASS ACTION LITIGATION

The historic origin and modern evolution of class action lawsuits offer insight into the elements the Court should consider when deciding whether to enforce the class action bar.

A.     Evolution of Class Actions as a Procedural Tool

Class actions grew out of the English common law.  *See* 1 Newberg on Class Actions § 1:9 (4th ed. 2008) (hereafter "Newberg").  Under the old divided law and chancery court system, English chancery courts developed the "Necessary Parties Rule."  *Id.*  The Rule mandated the joinder of all interested persons in one suit, so as to avoid multiplicative litigation.  *Id.; See* Geoffrey C. Hazard, John L. Gedid & Stephen Sowle, *A Historical Analysis of the Binding Effect of Class Suits*, 146 U. Pa. L. Rev. 1849, 1858-59 (1998).

As was the case with many English legal doctrines, the Necessary Parties Rule was incorporated into the United States' legal system. *See* Hazard, Gedid & Sowle, 146 U. Pa. L. Rev. at 1858-59. As early as the 1840s, the Federal Equity Rules, a precursor to the modern Federal Rules of Civil Procedure, had codified the mandatory joinder concept. *See* Newberg § 1:9. By 1912, the Equity Rules contained two provisions, Rules 27 (stockholders' bill) and 38 (representative of a class) that allowed absent parties to be bound by a judgment obtained by a representative member. *Id.*; *see also Hartford Life Ins. Co. v. Ibs*, 237 U.S. 662 (1915) (group of plaintiffs brought suit against insurer "in their own behalf and on behalf of all others similarly situated").

In the 1930s, upon the merger of law and chancery, the first version of the Federal Rules of Civil Procedure contained Federal Rule 23, an offshoot of the Equity Rules and the Necessary Parties Rule that had preceded it, but which was far more flexible than its predecessors. According to some commentators, the new Federal Rule 23 was adopted as a result of difficulty in joining the increasing numbers of litigants under the older equity rules. *See* Hazard, Gedid & Sowle, 146 U. Pa. L. Rev. at 1878. Rule 23 substantially revised former Equity Rules 27 and 38 by expanding the reach of class litigation outside the equity courts to allow representative suits, wherein a select group of litigants enforced or defended the rights of a larger class of parties, even if members of the class had not been joined. *See* Newberg § 1.9. Thus, although equity jurisprudence had allowed class-like suits in the past, the Federal Rules now allowed, for the first time, class suits for damages in the United States. *See* Newberg § 1.9.

21

Early opposition to class actions came largely from prospective class plaintiffs who resisted the possibility of being bound by a judgment obtained without their participation in the litigation.  *See* Abram Chayes, *Public Law Litigation and the Burger Court*, 96 Harv. L. Rev. 4, 26 (1982).  Perhaps because of this resistance, the early class action rule required a more concrete "jural" relationship between the proposed class members and the subject of the litigation than do modern class actions.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 823 (1999); Stephen C. Yeazell, *Group Litigation and Social Context:  Toward a History of the Class Action*, 77 Colum. L. Rev. 866, 877 (1977).  Each member of the class had to have an interest in the subject matter before the court, such that any member of the class could proceed in her own right.  Chayes*,* 96 Harv. L. Rev. at 26.  However, as litigation evolved, the depth of personal interest in the subject of the litigation that a prospective class member needed to have to sustain membership in the class began to erode and the role of the class action began to change.

The most critical step in the evolution of class litigation came in 1966, when the Advisory Committee adopted a substantial revision of the much-maligned original Federal Rule 23 and brought class actions into the modern era.  *See Amendments to Rules of Civil Procedure, Supplemental Rules for Certain Admiralty & Maritime Claims Rules of Criminal Procedure*, 39 F.R.D. 69, 97 (1966).  The Advisory Committee acknowledged that the rather arcane definitions used in the previous version of Federal Rule 23 and the uncertainty regarding the "proper extent of the judgments in class

actions" impeded the usefulness of Rule 23.  39 F.R.D. at 99; *see also Ortiz*, 527 U.S.

at 842.  Thus, the Committee sought to make the class action rule more "practical" for

courts and parties.  *Id.* at 99-100.  By doing so, it ushered in the era of widespread use

of class actions in American courts.

The new Federal Rule 23 accompanied (and likely helped to precipitate) the

paradigm shift towards the use of class actions for so-called "impact litigation."  Milton

Handler, *The Shift from Substantive to Procedural Innovations in Antitrust Suits – The*

*Twenty-Third Annual Antitrust Review*, 71 Colum. L. Rev. 1, 5-6 (1971) ("The impact [of

the 1966 revisions to Rule 23] has been due not so much to the literal text of the new

rule as to the broad and far-reaching use to which it has been put by the attorneys

representing treble damage claimants.").  Substantively, the 1966 revision broadened

Federal Rule 23's scope by eliminating the previous rule's requirement of a strict "jural

relationship" among putative class members.  *See* Newberg § 1:10.  The new rule also

proved far more flexible from a procedural aspect, and, as the American economy and

consumer culture grew more widespread, class actions under the revised Federal Rule

23 became an important procedural stick for marginalized plaintiffs to wield against

powerful defendants.  *See Amchem Prods., Inc. v. Windson*, 521 U.S. 591, 617 (1997)

("The policy at the very core of the class action mechanism is to overcome the problem

that small recoveries do not provide the incentive for any individual to bring a solo action

prosecuting his or her rights.") (quotations and citations omitted); *Discover Bank v.*

*Superior Court*, 113 P.3d 1100, 1109 (Cal. 2005); *cf. generally* Handler, 71 Colum. L.

Rev. 1 (arguing that "blockbuster" class actions in treble damages antitrust suits shift focus away from substantive law by adding "needlessly to the scope and complexity of litigation").

     B.     <u>Class Actions Remain a Procedural Tool, Not a Substantive Right</u>

     There is no question that class actions serve the goals of judicial efficiency and practicality by making multi-party litigation more expeditious and economical.  *See Califano*, 442 U.S. at 701 ("[T]he class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23."); *Gottlieb v. Wiles*, 11 F.3d 1004, 1007 (10th Cir. 1993) ("Rule 23 was intended to promote the efficient resolution of claims in cases involving multiple parties with similar claims, to eliminate repetitious litigation, and to avoid inconsistent judgments.") *overruled in part on other grounds by Devlin v. Scardelletti*, 536 U.S. 1 (2002).  Nonetheless, Federal Rule 23 clearly remains a procedural tool, not a substantive or jurisdictional right.  *See Ortiz*, 527 U.S. at 846 ("The Rules Enabling Act [for the 1966 revisions to the Federal Rules] underscores the need for caution.  As we said in *Amchem*, no reading of the Rule can ignore the Act's mandate that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'") (quotations omitted); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980) ("[T]he right of a litigant to employ Rule 23 is a procedural right only, ancillary to the litigation of substantive claims.").

24

Thus, the history and evolution of class action litigation demonstrates that class certification is a procedural mechanism, not a substantive right.  As such, this Court believes that a lesser level of scrutiny is applicable to an agreement by a party not to proceed as a class, as compared to the level of scrutiny that the Court would apply to a similar agreement purporting to waive a substantive right, such as the constitutional right to a jury trial.  *See, e.g., Dreiling v. Peugeot Motors of Amer., Inc.*, 539 F. Supp. 402, 403 (D. Colo. 1982) (discussing contractual waiver of jury trial right).  With the theoretical and historical considerations of class litigation in mind, the Court now turns to the initial step in its analysis of whether the class action bar provision should be enforced in this case, *i.e.*, which party bears the burden regarding its enforceability or unconscionability.

## V.   PLAINTIFFS BEAR THE BURDEN OF SHOWING THE CLASS ACTION BAR IS UNENFORCEABLE OR UNCONSCIONABLE

Plaintiffs analogize the class action bar provision of Section 21.4 to a jury trial waiver provision.  Based on this analogy, Plaintiffs argue that Quiznos bears the burden to show that Plaintiffs voluntarily and knowingly relinquished their "right"[12] to proceed as a class.  (*See, e.g.,* Doc. # 296 at 11.)  In support of their argument, Plaintiffs rely heavily on *Dreiling*, which involved a jury trial waiver in a contract between an auto manufacturer and its dealership.  539 F. Supp. at 403.  According to Plaintiffs,

---

[12]   The parties refer to class certification as a "right," so the Court will use this terminology as well.  However, as discussed below, this terminology is questionable.  At most, the "right" to proceed as a class is procedural rather than substantive.

*Dreiling* supports the idea that a powerful franchisor like Quiznos cannot enforce a class action "waiver" contained in a take-it-or-leave-it franchise agreement.

Quiznos responds that the right to proceed in a class action is procedural only and is distinct from a Constitutional right like a the right to a jury trial. Quiznos contends that the clause is not a waiver in the true sense of that term and, therefore, Plaintiffs, as the parties seeking to avoid application of a contractual term, bear the burden of showing that the class action bar is unconscionable. Thus, Quiznos contends that it does not have to make the same showing that would be required if dealing with a jury trial waiver. Alternatively, Quiznos contends that Plaintiffs have knowingly waived their "right" to proceed as a class.

The Court finds that the ability to proceed as a class is not akin to the right to a jury trial (or any other substantive or Constitutional right, for that matter). Because a jury trial is guaranteed by the Constitution, courts do not have discretion with respect to deciding whether or not to allow a trial by jury - that is a decision made by the parties. Notably, the history of class litigation reflects that the courts, not the parties, determine whether a suit should proceed on a class basis. Courts make this decision as a matter of judicial efficiency, not out of an obligation to uphold the parties' substantive rights, a fact that the Supreme Court continues to reiterate. *See Califano*, 442 U.S. at 701. In short, Plaintiffs do not have a substantive "right" to proceed as a class. *See, e.g., Ortiz*, 527 U.S. at 846; *Amchem*, 521 U.S. at 617; *Roper* 445 U.S. at 332. Thus, a jury trial waiver provision is not analogous to a class action bar provision.

This distinction leads the Court to conclude that *Dreiling* is inapposite to the facts

of this case.  As the parties seeking to escape application of an unambiguous

contractual provision, the burden rests on Plaintiffs to show that the Court should not

enforce the class action bar provision.  *See, e.g., Harris v. Green Tree Fin. Corp.*, 183

F.3d 173, 182 (3d Cir. 1999) ("The party challenging a contract provision as

unconscionable generally bears the burden of proving unconscionability.").  As shown

below, Plaintiffs have not satisfied that burden in this case.[13]

## VI.   PREVIOUS OPINIONS REGARDING CLASS ACTION BAR PROVISIONS OFFER LITTLE GUIDANCE

Numerous earlier cases have addressed class action and/or class arbitration

bars, usually in the context of mandatory arbitration clauses.  Unfortunately, these

cases offer little precedential value because, in most instances, they rely on wholly

inapplicable legal standards or specific state laws that do not translate well to Colorado

law.  Even the one case the Court has located that deals specifically with a non-

arbitration class action bar provision provides very little guidance.  Regardless, because

---

[13]   Alternatively, if Quiznos did have to show that Plaintiffs knowingly and voluntarily waived their ability to proceed as a class, Quiznos has met that burden for many of the same reasons the Court finds that the waiver is not unconscionable under Colorado law.  *See infra*. For example, the following facts indicate that Plaintiffs knowingly and voluntarily agreed to "waive" their right to proceed as a class:  Plaintiffs understood what the language in Section 21.4 meant, Quiznos allowed and encouraged prospective franchisees to consult with an attorney before signing the franchise agreement, and many Plaintiffs had previous business experience, if not previous franchise experience.  Moreover, as noted below in the discussion on unconscionability, the waiver was printed in normal typeface, and was not hidden from other contract terms.  Contrary to Plaintiffs' position that prospective franchisees should be treated with deference because Quiznos offered them the franchise agreement on a take-it-or-leave-it basis, this fact alone does not render a waiver unenforceable.  *See Postnet Int'l Franchise Corp. v. Amercis Int'l, Inc.* 2006 WL 1775599 (D. Colo. June 26, 2006).

the parties have raised these cases in their briefs and at oral argument, the Court will address them and note any applicable holdings.

    A.    <u>The *Kristian* and *American Express* Decisions Do Not Apply</u>

Plaintiffs devote much of their argument to the First Circuit Court of Appeals' decision in *Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006), and the Second Circuit Court of Appeals' decision in *In re Amer. Express Merchs. Litig.*, 554 F.3d 300 (2d Cir. 2009). In both cases, the respective appellate courts declined to enforce arbitration clauses that would have precluded the plaintiffs from pursuing their antitrust claims in a class context.

In *Kristian*, the class of plaintiffs consisted of cable television customers who claimed that the defendants, a group of cable television providers, had violated antitrust laws by unlawfully attempting to consolidate the market for cable television. 446 F.3d at 30. Defendants moved to compel arbitration under a provision in their consumer contract. *Id.* at 31. Notably, the contract also precluded class or consolidated arbitration. *Id.* The plaintiffs opposed enforcement of the arbitration provision because they said it would prevent them from "vindicating their statutory rights." *Id.* at 37.[14] The *Kristian* plaintiffs also argued that the arbitration clause/class action bar was unconscionable under state law. 446 F.3d at 63. However, the First Circuit Court of

---

[14] The "vindication of statutory rights" argument stems from the Supreme Court case of *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985). In *Mitsubishi*, the Supreme Court enforced a contractual arbitration provision and forced the counterclaimant to arbitrate its antitrust claims. *See generally id.* The Court held that a clause requiring arbitration of statutory claims was valid "so long as the prospective litigant effectively may **vindicate its statutory cause of action** in the arbitral forum." *Id.* (emphasis added).

Appeals did not perform an unconscionability analysis because it concluded that the federal substantive law of arbitrability (*i.e.*, *Mitsubishi* and the Federal Arbitration Act) supplied the more appropriate rule of decision.  *Id.*

In arriving at its decision, the *Kristian* court acknowledged that the balance of other circuits favored enforcement of the class action bar, but only slightly.  *See id.* at 55 (noting that decisions from the Third, Seventh, and Eleventh Circuits have upheld consumer class action bars).  However, *Kristian* distinguished the applicability of these cases largely on the ground that each of the previous circuit court decisions enforcing class arbitration bars involved claims against financial lenders under the Truth In Lending Act ("TILA"), whereas the claims in *Kristian* involved the Sherman Act and other antitrust laws.  *Id.* at 56-57.  The *Kristian* court found that the "sheer complexity" of an antitrust claim required an intensive factual analysis and prohibitively expensive expert testimony that a TILA claim did not.  *Id.* at 59.  Because of the costs and legal intricacy involved in the claims at issue, *Kristian* concluded that the plaintiffs could not enforce their rights, except on a class basis.  *Id.* at 59-61.  Thus, the *Kristian* court concluded that the class arbitration bar ran afoul of the economic and social goals contemplated by antitrust law.  *Id.* at 61 ("[T]he social goals of federal and state antitrust laws will be frustrated because of the 'enforcement gap' created by the *de facto* liability shield.").  The court, therefore, refused to enforce the class-precluding arbitration provision.  *Id.*

Similarly, *American Express* involved a motion to compel arbitration of claims under antitrust law.  554 F.3d at 307-08.  The *American Express* plaintiffs, a group of

merchants that had contracted with American Express for credit card services, alleged that American Express had forced them to accept supracompetitive billing rates for credit card services in violation of Section 1 of the Sherman Act. *Id.* at 308. American Express moved to compel arbitration pursuant to the applicable contracts, which also contained a provision barring class or representative arbitration. *Id.* The district court granted American Express' motion and left the question of enforceability of the class arbitration bar for the arbitrator to decide. *See In re Amer. Express Merchs. Litig.*, 2006 WL 662341, at *4-*5 (S.D.N.Y. Mar. 16, 2006). The plaintiffs appealed, arguing that the district court had erred in referring the enforceability of the class arbitration bar to the arbitrator and that enforcement of the class bar precluded them from vindicating their rights under the Sherman Act. The Second Circuit Court of Appeals agreed with the plaintiffs and reversed.

The Second Circuit found that enforceability of the class arbitration bar was a question for the court, not the arbitrator. 554 F.3d at 310-11. Then, like the *Kristian* court, the Second Circuit found that the unique and prohibitively expensive aspects of antitrust litigation precluded the plaintiffs from pursuing their claims on an individual basis:

> Concluding that Amex has brought no serious challenge to the plaintiffs' demonstration that their claims cannot reasonably be pursued as individual actions, whether in federal court or in arbitration, we find ourselves in agreement with the plaintiffs' contention that enforcement of the class action bar in the Card Acceptance Agreement 'flatly ensures that no small merchant may challenge American Express's tying arrangements under the federal antitrust laws.'

*Id.* at 319.

As with *Kristian*, the impetus behind the decision in *American Express* was the "public interest in vigilant enforcement of the **antitrust laws** through the instrumentality of the private treble-damage action," which could not be squared with an agreement that conferred *de facto* immunity from civil liability to American Express.  *Id.* (quotations omitted and emphasis added) (citing *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 329 (1955).  Significantly, *American Express* did not address whether the class waiver was enforceable under the state law of unconscionability.  *See id.* at 320 (citing cases decided under state unconscionability laws and noting that "We do not follow these cases because they all rely on findings of unconscionability under state law, while we have relied here on a vindication of statutory rights analysis, which is party of the federal substantive law of abitrability.")

In addressing *Kristian* and *American Express*, Quiznos argues that this Court should follow *Ornelas v. Sonic-Denver T, Inc.*, 2007 WL 274738 (D. Colo. Jan. 29, 2007), a previous decision from this district that declined to follow *Kristian* (*American Express* had not been decided).  In *Ornelas*, the plaintiff sought to bring a class action against a local Toyota dealership because of alleged discrimination against non-English speakers in its leasing practices.  *Id.* at *1.  The dealership moved to compel arbitration and the plaintiff resisted claiming that the arbitration clause was unenforceable.  *Id.* at *3.  Like *Kristian* and *American Express*, the arbitration clause in *Ornelas* precluded class arbitration.  *Id.* at *5.  Judge Figa rejected the plaintiff's argument that

31

*Kristian* should apply because he found that *Kristian* was limited to antitrust cases. *Id.* at * 6. Although Judge Figa did not go into great depth on the issue, he also found that at least one other court in the Tenth Circuit had upheld a consumer arbitration agreement precluding class arbitration and he saw no reason why such a provision would be automatically unconscionable or unenforceable. *See id.*; *see also Edwards v. Blockbuster, Inc.*, 400 F. Supp. 2d 1305 (E.D. Okla. 2005).

*Ornelas*, *Kristian* and *American Express* are all distinguishable from the instant case because this case does not involve an arbitration clause that also contains a class arbitration bar. The franchise agreement in the case at hand does not mandate arbitration; rather it precludes class or consolidated actions in this Court. Thus, the vindication of statutory rights analysis applied in *Kristian* and *American Express* is not directly applicable here because the enforceability question is not one of arbitrability, but of unconscionability under Colorado law.[15]

The arbitration distinction notwithstanding, this Court agrees with Judge Figa's decision in *Ornelas* and finds that this case is distinguishable from *Kristian* and *American Express.* As Judge Figa noted in *Ornelas*, the critical distinction between *Kristian* or *American Express* and this case is the nature of the claims at issue: antitrust versus what is essentially common law fraud. In *Kristian* and *American Express*, the courts relied on the unique, *i.e.*, complicated and expensive, aspects of antitrust law to

---

[15]   *Kristian* acknowledged that "there are striking similarities between the vindication of statutory rights analysis and the unconscionability analysis."  446 F.3d at 63.  However, this similarity notwithstanding, *Kristian* explicitly declined to analyze state unconscionability law.

support their refusal to enforce the arbitration clauses/class arbitration bars at issue.  In both cases, the plaintiffs had presented evidence that their claims would require intricate legal analysis and expert testimony that might cost the plaintiffs upwards of one million dollars in expert fees alone.  *See, e.g.,* 554 F.3d at 317.  When the appellate courts weighed this massive initial expense with the relatively small amount of individual monetary damages, both courts concluded that no plaintiff could or would pursue an individual antitrust claim against the defendants.  Thus, under the circumstances of those antitrust cases, the class arbitration bars provided *de facto* immunity to the defendants.

In this case, by contrast, Plaintiffs' claims involve comparatively simple fraud and consumer protection-type claims.  The majority of Plaintiffs' evidence will come from the plaintiffs themselves, rather than paid experts.  Indeed, this evidentiary distinction is borne out by the number of personal declarations that Plaintiffs have submitted with their class certification briefs (over a dozen) versus the number of expert declarations (one).  In other words, although Plaintiffs may hire an expert to support their case, the nature of their claims does not require the massive investment of resources that was required in *Kristian* or *American Express*.

This case also differs from *Kristian* and *American Express* in terms of the amount of Plaintiffs' prospective individual monetary recovery.  In *Kristian*, the court found that recovery would likely be limited to hundreds or perhaps several thousand dollars per plaintiff.  In *American Express,* the median individual recovery, **after trebling**, was just

over $5,000.  In the instant case, both parties agree that Plaintiffs typically paid between

$20,000 and $25,000 for their initial franchise fee.[16]  Thus, if they prevail, Plaintiffs in the

instant case stand to receive an average of $60,000 to $75,000 after trebling, *i.e.*,

significantly more damages than either the *American Express* or the  *Kristian* plaintiffs.[17]

This larger potential for individual recovery cuts against Plaintiffs' argument that the

class action bar in this case is analogous to the provisions at issue in *Kristian* or

*American Express.*

    The vindication of statutory rights analysis upon which the decisions in *American*

*Express* and *Kristian* were based, does not apply to Plaintiffs' claims in the instant case.

Moreover, this case lacks the massive cost and the *de minimus* individual recovery that

lead the *Kristian* and *American Express* courts to strike down the class arbitration bars

at issue in those cases.  Therefore, the Court concludes that *Kristian* and *American*

*Express* are not applicable to the enforceability of the class action bar in this case.

    B.    <u>Previous Decisions Based on State Unconscionabilty Law Provide Little
Guidance</u>

    Aside from antitrust cases, a handful of federal courts applying a state law

unconscionability analysis have also refused to enforce arbitration clauses that preclude

class actions.  *See, e.g., Douglas v. United States Dist. Court*, 495 F.3d 1062 (9th Cir.

2007) (applying California law); *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) (same);

---

    [16]  Although, in some cases, the amount was lower and, in some cases, Plaintiffs paid
multiple fees, by far the most common amounts were either $20,000 or $25,000.

    [17]  Moreover, Plaintiffs can recover the attorneys fees pursuant to the CCPA and they
can recover their costs pursuant to Federal Rule 54(d).

*Luna v. Household Finance Corp. III*, 236 F. Supp. 2d 1166 (W.D. Wash. 2002) (applying Washington law).  Likewise, a few state courts applying state unconscionability law have also declined to enforce provisions that precluded class arbitration.  *See, e.g., Cohen v. DirecTV, Inc.*, 48 Cal. Rptr. 813 (Cal. Ct. App. 2006) (applying California law); *Powertel, Inc. v. Bexley*, 743 So. 2d 570 (Fla. Dist. Ct. App. 1999) (applying Florida law).  On the other hand, at least one state court in New York has enforced an arbitration provision that would have precluded class arbitration.  *See Hayes v. County Bank*, 811 N.Y.S.2d 741 (N.Y. App. Div. 2006) (enforcing class arbitration bar under New York law).

Unfortunately, these cases offer only marginal guidance because, in most instances, they involved critically different factual and legal circumstances and unique contractual provisions that render them inapplicable to the instant case.  For example, most of the cases cited by the parties and those discovered by the Court's own research focused on whether an *arbitration* clause that barred class actions should be enforced.  However, that issue does not arise in this case since there is no arbitration provision.  Moreover, with the exception of California, which has radically different consumer protection laws than Colorado, there is no clear trend among the states on this issue.  *Compare, e.g., Hayes*, 811 N.Y.S. 2d at 743 (applying New York law and finding that "the fact that the arbitration agreements effectively preclude [plaintiff] from pursuing a class action does not alone render them substantively unconscionable") *with Cohen*, 48 Cal. Rptr. at 822-23 (applying California law and noting that "class action

waivers may be found unconscionable in a variety of circumstances"). Due to the varied nature of the decisions and the critical factual and legal distinctions, the Court can draw little guidance from these previous decisions.

Even the lone case that contains a non-arbitration class action bar provides almost no guiding precedent. *See In re Yahoo! Litig.*, 251 F.R.D. 459 (C.D. Cal. 2008) (withholding judgment on enforceability of class action bar under California law).[18] A purported class of Yahoo advertisers sued the internet search engine company alleging that Yahoo had failed to properly place advertisements in a "targeted" manner. 251 F.R.D. at 461-62. Yahoo moved to dismiss the complaint pursuant to Federal Rule 12(b)(6) on the basis that the advertisers were precluded from suing as a class because of a class action bar provision in the Yahoo advertising contract they had signed. *Id.* at 463. In addressing Yahoo's motion, the Central District of California reviewed California law on the topic and found that a class action "waiver" was neither *per se* enforceable (as Yahoo argued) or *per se* unconscionable (as the plaintiffs argued). *Id.* at 468-69. In so holding, Judge Snyder found that the question of enforceability of a class action bar should be based on a well-developed factual record and that no hard-and-fast rules should apply. *Id.* The court then denied the motion to dismiss without prejudice, thus allowing Yahoo to reassert the issue after discovery. *Id.*

---

[18] The contract clause in *Yahoo!* was a pure class action bar, similar to the clause in Section 21.4 of the franchise agreement in this case, as distinguished from the arbitration provisions at issue in nearly all of the other cases that have addressed the class action bar. *See* 251 F.R.D. at 468-69.

Thus, even *Yahoo*, which is analogous to this case, provides this Court with no clear direction regarding class action bars. However, this Court agrees with Judge Snyder that no bright line tests should apply and, in fact, Judge Snyder's pronounce-ment falls right in line with Colorado law on unconscionability, to which the Court now turns.

## VII.   UNCONSCIONABILITY UNDER COLORADO LAW

Although the instant case began in New Jersey, the parties now agree that, pursuant to the choice of law clause in the franchise agreement, Colorado law (as well as federal law, when appropriate) will apply.

### A.   Applicable Law

Courts applying Colorado law start with the presumption that a contract clause is enforceable. *See Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003) ("We will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction."); *see also State Farm Mut. Auto. Ins. Co. v. Stein*, 940 P.2d 384, 387 (Colo. 1997) (same). The fact that the contract benefits one party more than the other does not alter the presumption of enforceabilty. *See, e.g., Thurmon v. Skipton*, 403 P.2d 211, 214 (Colo. 1965) ("Courts will enforce a contract as made, regardless of whether it is an improvident one from the standpoint of one of the parties."); *Roberts v.* Adams, 47 P.3d 690, 696 (Colo. Ct. App. 2001) (same); *Sedalia Land Co. v. Robinson Brick & Tile Co.*, 475 P.2d 351, 354 (Colo. Ct. App. 1970) ("The general rule is that, if a party enters into a contract or any other

legal transaction with sufficient mental capacity to understand it, and not under the

influence of fraud, coercion or imposition, the courts will not relieve him of the

consequences of his act on the sole ground that the bargain is improvident as to him.").

As such, and as noted above, the party seeking to avoid application of a contractual

provision bears the burden of showing that it is unconscionable.  *See, e.g., Kerr-McGee*

*Corp. v. Northern Utils., Inc.*, 673 F.2d 323, 329 (10th Cir. 1982) (applying Wyoming

law); *ADT Sec. Servs., Inc. v. Envision Telephone, Inc.*, 2008 WL 5064268, at *5 (D.

Colo. Nov. 21, 2008) (applying Washington law).

Notably, none of the cases disclosed by the parties (and none found by the

Court) involve the application of Colorado law to an unconscionability challenge to a

class action bar provision identical to the one at issue in this case.[19]  However, the

Colorado Supreme Court has adopted a seven factor test to determine whether a

particular contractual provision is unconscionable.  *See Davis v. M.L.G. Corp.*, 712 P.2d

985, 991 (Colo. 1986) (discussing unconscionability in context of an automobile rental

contract).

In *Davis*, the Colorado Supreme Court listed seven non-exclusive factors that

courts can consider in determining whether to enforce a contract provision:

(1)     Is the agreement a standardized/form agreement made by parties with
unequal bargaining power?

(2)     Did the parties have an opportunity read and become familiar with the
document before signing it?

---

[19]   Nor does it appear that a court applying Colorado law has addressed the issue of
unconscionability in the franchisor/franchisee context.

      (3)     Did the document bury the provision in fine print?

      (4)     Is the provision commercially reasonable?

      (5)     Is the provision substantively unfair?

      (6)     What is the relationship between the parties?  Was there notice or surprise?

      (7)     What are the remaining circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect?

*Davis*, 712 P.2d 985 at 991.

*Davis* advises that no one factor predominates and courts should examine each of the factors in conjunction with the entirety of the circumstances surrounding the transaction.  *Id.*  If the entirety of the circumstances discloses evidence of "overreaching" by one party that causes a contract provision to unreasonably favor that party to the detriment of the other party, a court should decline to enforce the provision.[20]  *See id.*; *see also Leprino v. Intermountain Brick Co.*, 759 P.2d 835, 836-37 (Colo. Ct. App. 1988) (unconscionability under UCC sale of goods contract); *McMillion v. McMillion*, 522 P.2d 125, 129 (Colo. Ct. App. 1974) (unconscionability under dissolution of marriage contract) (unpublished opinion).

Regardless of the test used, the question of unconscionability is a matter of law, *Leprino*, 759 P.2d at 836, and the results obtained by any formulation of the test are the same; if a contract clause is unconscionable, a court should not enforce it.  *See, e.g., Davis*, 712 P.2d at 991 (declining to enforce unconscionable provision).  On the other hand, if a party cannot meet its burden to show that the contract clause is

---

[20]  Likewise, although it is not directly applicable to the facts of this case, the U.C.C. recognizes that a contract term's "commercial setting, purpose, and effect" may aid the court in determining whether a term is unconscionable.  *See* C.R.S. § 4-2-302(2).

unconscionable, the court will enforce it. *Jones v. Dressel*, 623 P.2d 370, 374-75 (Colo.

1981) (enforcing exculpatory clause in non-adhesionary contract).

      B.    <u>Enforceability of the Class Action Bar Under Colorado Law</u>

      With the above-discussion of Colorado law in mind, the Court now reaches the

crux of the issue of this Motion:  Is the class action bar enforceable?  Or, more

specifically, is the class action bar unconscionable under Colorado law?

      Plaintiffs assert two primary arguments against enforcement of the class action

bar:  (1) that Quiznos' sales process infected the entire franchise agreement with fraud,

thereby rendering the bar unconscionable, and (2) that enforcement of the class action

bar is substantively unfair.

      1.    *The Franchise Agreement is a Standard Form Contract*

      Plaintiffs contend that the first *Davis* factor, whether the contract was a standard

form or negotiated, favors their position.  The Court agrees, but Plaintiffs' advantage on

this issue is slight.

      It is undisputed that Quiznos offered franchisees a standard form franchise

agreement on a take-it-or-leave-it basis.  This fact suggests the potential for

unconscionability and overreaching by Quiznos.  However, unlike the California

cases upon which Plaintiffs rely, under Colorado law, a take-it-or-leave-it contract does

not automatically render the agreement unconscionable.  *See Batterman v. Wells Fargo*

*Ag Credit Corp.*, 802 P.2d 1112, 1116 (Colo. Ct. App. 1990) (holding that lender could

use superior bargaining position and require "protective terms in the contract" without

40

rendering the contract adhesory); *Clinic Masters, Inc. v. District Court for County of El Paso*, 556 P.2d 473, 475-76 (Colo. 1976) (holding that form contract offered on a take-it-or-leave it basis does not render a contract unconscionable).  Moreover, the parties in this case did not have an ongoing relationship prior to executing the franchise agreement.  Thus, Plaintiffs were not faced with the Faustian decision of terminating their pre-existing contract or accepting a newly-added class action bar they did not want.  *Cf. Discover Bank v. Superior Court*, 113 P.3d 1100, 1103-04 (Cal. 2005) (declining to enforce class arbitration bar when credit card issuer added bar in a take-it-or-leave-it change of terms provision to existing agreement).  Moreover, Plaintiffs did not have to enter in the franchise agreement with Quiznos.  They were free to purchase a different franchise or invest their money elsewhere without any financial repercussions to themselves or Quiznos.  *See Jones*, 623 P.2d at 375 (no adhesion contract when services provided by defendant could be obtained elsewhere); *Clinic Masters*, 556 P.2d at 476 (fact that services could be purchased elsewhere militates against finding of unconscionability).

However, the fact remains that Plaintiffs could not truly negotiate or re-write any provisions of the franchise agreement, including the class action bar.  Therefore, because the class action bar is undeniably part of a form agreement signed by parties with unequal bargaining strength, the first *Davis* factor cuts mildly in Plaintiffs' favor.

2.      *Plaintiffs Had Ample Opportunity to Read the Franchise Agreement Before Signing It*

The second *Davis* factor, whether the prospective franchisees had a chance to read and become familiar with the document before signing it, favors enforcement of the class action bar.

Quiznos provided a copy of the franchise agreement with the UFOC ten days prior to allowing a potential franchisee to sign the contract.  Moreover, Quiznos encouraged franchisees to consult with a lawyer.  Plaintiffs contend that this was insufficient because Quiznos did not tell the potential franchisees that "there was only one acceptable way to complete the Disclosure Acknowledgment Statement[21] ("DAS") until the day the DAS was to be signed." (Doc. # 296 at 10.)  However, the defect in disclosure that Plaintiffs identify does not relate to the class action bar and the alleged infirmity with the UFOC does not reduce the amount of time that franchisees had to read the franchise agreement.  Thus, Plaintiffs cannot deny that they had at least ten days to review a copy of the franchise agreement before they signed it.  In fact, most of the Plaintiffs admit that they read some or all of the agreement before signing it.  Regarding those franchisees who chose not to read the franchise agreement (or chose not to read all of it), the decision not to read the agreement before signing does not change the fact that Quiznos gave franchisees **the opportunity** to read the agreement.

Given the ten-day disclosure and the ability of the Plaintiffs to procure legal counsel, this factor cuts squarely in Quiznos' favor.

---

[21]   The DAS was a form that each franchisee signed to acknowledge Quiznos' compliance with federal franchise law.  By signing the DAS, each franchisee theoretically verified that Quiznos made the appropriate disclosures and allowed the franchisees to review those disclosures prior to executing the franchise agreement.

3.      *Section 21.4 Does Not Use Fine Print*

The third *Davis* factor, the use of fine print or other typographical trickery, also favors enforcement of the provision.

Plaintiffs argue that Quiznos strategically placed the class action bar in the middle of a paragraph near the end of the forty-page agreement and this placement suggests unconscionability.  The Court disagrees.  The provision containing the class action bar is written in the same typeface, using the same font size as the remainder of the franchise agreement.  The fact that it comes towards the end of the agreement does not make it any more difficult to see or understand than a provision placed on the third or thirteenth page of the franchise agreement.  With certain exceptions, courts should not be in the business of telling parties how to style their contracts and this case is no exception.  Therefore, this factor also favors enforcement of the class action bar.

4.      *The Waiver Serves a Commercial Purpose*

The fourth *Davis* factor, the absence of a commercially reasonable justification for the class action bar, is almost even between the parties.  But, on the evidence before it, the Court concludes that it tips slightly in favor of enforceability.

Undoubtedly, the class action bar makes mass litigation more difficult for Quiznos' franchisees.  Thus, the waiver potentially reduces the number of large lawsuits that Quiznos faces from disgruntled franchisees.  This reduction in litigation could plausibly serve a commercial purpose, at least from Quiznos' perspective.  Like other provisions that discourage litigation, even meritorious litigation, *e.g.*, exculpatory

43

clauses, contractual statutes of limitations, limitations on punitive damages, etc., the class action bar likely benefits Quiznos' bottom line.  Quiznos attempts to phrase it in somewhat more favorable terms and contends that the class action bar reduces dispute resolution costs and affords "greater predictability in decision-making, budgeting and planning" for Quiznos and its franchisees.  (Doc. # 301 at 9.)  Although the Court questions whether Quiznos really wants to open up the possibility of thousands of individual lawsuits by disgruntled SNOs, and whether such a result would be commercially beneficial, it is not this Court's responsibility to question the seemingly rational, somewhat heavy-handed business choices made by private parties in their contractual dealings.

Plaintiffs do little to refute Quiznos' position on this factor, but instead try to spin it in their favor in other portions of the *Davis* analysis, mainly the substantive unfairness factor.  They contend that a reduction in litigation serves no commercial purpose from their point of view.  But, the fact that the class action bar discourages litigation, even if it is a somewhat nefarious goal from Plaintiffs' perspective, does serve a commercial purpose from Quiznos' perspective.

Thus, if Quiznos' business theories are to be believed, and Plaintiffs offer this Court no reason not to believe them, this factor favors enforcement of the class action bar, if only slightly.

5.  *The Class Action Bar is Not Substantively Unfair*

The fifth factor is perhaps the most important to the discussion on unconscionability:  whether the class action bar is substantively unfair.  The Court finds that it is not.

Plaintiffs essentially adopt the balancing test – cost to bring individual lawsuits versus amount of individual recovery – used in *Kristian* and *American Express* to strike down class action/class arbitration bars.  They argue that because of the large number of SNOs and the small amount of money at stake for each individual SNO, only a class action will provide a fair forum for their complaints.  Conversely, if the Court enforces the class action bar, Plaintiffs argue that they would be left without a way to vindicate their legal rights.  Thus, they contend that the class action bar is substantively unfair.  However, as noted above in the section dealing with earlier judicial treatment of class action bars, a number of factors in this case reveal that individual actions, although perhaps more costly in the aggregate, are not unfathomable or unfair.

First and foremost, the SNOs could bring individual lawsuits.  In this case, the SNOs typically spent between $20,000 and $25,000 for their franchises.  This amount of money is a far cry from the three- and four-figure-per-plaintiff amounts in cases like *Kristian* or *American Express.*  Further, when trebled, the per-SNO damages figure rises solidly into mid- or upper-five figure recoveries per franchisee.  Plaintiffs have submitted a few affidavits from attorneys who stated that they would not take a SNO's case because of the small amount of money involved.  But, these proud attorneys notwithstanding, the Court cannot say that a franchisee who stands to recover $60,000

to $75,000 **plus attorneys fees** will be left wanting for competent legal representation.[22]

Moreover, an individual case would not require a large up-front investment of resources.  The legal issues in this case, unlike those in *Kristian* or *American Express*, do not require expensive expert analysis or massive, widespread discovery.  Because the amount of available damages is sufficient and the cost to bring an individual lawsuit is not overwhelming, individual franchisees would not experience the same type of economic roadblocks that the plaintiffs in *Kristian* or *American Express* would have experienced.

Second, the fact that the provision may benefit Quiznos more than the franchisees is not enough to render it substantively unfair.  Admittedly, the class action bar benefits Quiznos, potentially at the franchisees' expense.  But, Colorado contains important distinctions in this area of law from other states on which Plaintiffs rely (*i.e.*, California).  Significantly, Colorado does not require bilaterality for a contract to be enforceable.  *Compare Morris v. Belfor USA Group, Inc.*, 201 P.3d 1253, 1260 (Colo. Ct. App. 2008) ("[I]n Colorado, a fee-shifting provision need not be mutual to be enforceable.") *with Ting*, 319 F.3d at 1150 ("'bilaterality' is a requirement in all California arbitration agreements").  Thus, the fact that the class action bar works solely or

---

[22]   Other individual Quiznos franchisees have brought at least thirty lawsuits against Quiznos for the return of the franchise fee after they failed to open a restaurant within one year. (Doc. # 259 at 18.)  Interestingly, counsel for Plaintiffs has represented at least some of the previous franchisee litigants in individual suits against Quiznos for the return of the franchisee fee.  (*Id.*)

primarily to Quiznos' advantage does not render the provision substantively unfair.  *See,*

*e.g., Rains v. Foundation Health Sys. Life & Health*, 23 P.3d 1249, 1255 (Colo. Ct. App.

2001) ("Under Colorado law, every contractual obligation need not be mutual as long as

each party has provided some consideration for the contract.").

Therefore, because Plaintiffs have not shown that the class action bar would

preclude them from obtaining legal redress, and because bilaterality of contractual

terms is not required under Colorado law, Plaintiffs have not shown that the class action

bar is substantively unfair.

6.    *The Parties' Relationship Does Not Render the Waiver*
      *Unconscionable*

The sixth *Davis* factor, the nature of the parties' relationship, supports Plaintiffs'

position, but again, only slightly.  Plaintiffs argue that franchisees stand at a unique

power disadvantage when dealing with franchisors.  Quiznos attempts to paint potential

franchisees as savvy business investors capable of asserting their own interests.

Against these competing visions, the Court that finds neither side has portrayed a

completely accurate picture of the parties' relationship, but that Plaintiffs'

characterization is the more accurate of the two.

Quiznos contends that the relationship between it and its franchisees is an

entirely equal, arms-length situation.  Moreover, unlike many of the cases cited by

Plaintiffs, Colorado law does not automatically afford special protection to franchisees in

the same manner that it protects consumers.  Compare *IJL Dominicana S.A. v. It's Just*

*Lunch Int'l, LLC*, 2009 WL 305187, *3 (C.D. Cal. Feb. 6, 2009) (noting that, under

California law, franchise agreements "share common aspects of consumer contracts") with *RHC, LLC v. Quizno's Franchising, LLC*, 2005 WL 1799536, *8 (Colo. Dist. Ct. July 19, 2005) (noting in case involving Quiznos franchisee that franchisor-franchisee is an arms-length commercial relationship).  Further, in contrast to uninitiated consumers purchasing a cell phone or signing up for a credit card, the purchasers of these franchises were making a major investment involving tens of thousands of dollars in up-front fees and even more than that amount of money over the prospective life of their franchise.  Thus, one would expect that plaintiffs entering into such a relationship would do so with a bit more cognizance than a teenager purchasing a phone at the mall.

Nonetheless, it is clear that Quiznos retains far greater power in the parties' relationship than any one franchisee, as Plaintiffs' expert, Professor Resenbloom, points out.  Indeed, there would be no reason for the franchisees to form the owners' groups that they have formed if they had a truly equal relationship with Quiznos.  Additionally, as noted above, Quiznos relied on a form contract that the franchisees could not negotiate or re-write in any way.

Thus, when the Court views the competing versions of the parties' relationship, it finds that Quiznos retained the bulk of the bargaining power.  However, this is only one factor of seven, and, as noted, Colorado law does not provide *per se* protection to franchisees.  Therefore, the Court finds that this factor alone does not render the class action bar unconscionable.

> 7.    *Other Circumstances Surrounding Formation of the Agreement*

Plaintiffs contend that the fraudulent nature of the Quiznos' franchise sales pitch infects the enforceability of the class action bar.  The Court disagrees.

Many of the facts that Plaintiffs rely on to support this argument are subsumed elsewhere in the Court's analysis of the *Davis* factors and they fail to support Plaintiffs' argument, *e.g.*, the typeface and location of the class action bar and the ten-day waiting period between Quiznos' disclosure of the franchise agreement and a franchisee's execution of the contract.  However, even if the Court were to accept Plaintiffs' allegations regarding the questionable nature of Quiznos' scripted franchise marketing pitch, Plaintiffs have pointed to nothing in that pitch that goes directly to enforceability of the class action bar.[23]  Plaintiffs' assertions that Quiznos fraudulently induced them into signing the franchise agreement with representations regarding real estate assistance do not affect the enforceability of the dispute resolution clause, which is a completely unrelated and severable provision.  Indeed, not once in their declarations or supporting documents do Plaintiffs identify an alleged misrepresentation concerning the dispute resolution clause in the franchise agreement.  The Court views the class action bar as akin to other types of dispute resolution clauses, which require targeted allegations of fraud to be rendered unenforceable.[24]  *See, e.g., Ornelas* 2007 WL 274738 at *5 ("Because plaintiff challenges the validity of the Lease Agreement, but not specifically

---

[23]  Plaintiffs repeatedly characterize Quiznos' sales strategy as "aggressive," as if repeating the word enough times and adding emphasis in their briefs somehow equates it with "fraudulent."  (*See, e.g.,* Docs. # 235 at 2; 299 at 2.)

[24]  In so holding, the Court echoes Judge Cavanaugh's analysis of the venue selection provision.  *See supra.*

49

its Arbitration Provision, the provision may be enforceable even apart from the remainder of the contract.").  Therefore, this factor does not support a finding of unconscionability.

8.     *The* Davis *Factors Reflect That the Class Action Bar Should Be Enforced*

Plaintiffs have not demonstrated any unreasonable "overreaching" by Quiznos that would render the class action bar provision unconscionable.  The most important *Davis* factors – substantive fairness and commercial purpose – favor enforcement of the class action bar.  Thus, the Court concludes that the class action bar is not unconscionable under Colorado law.  The Court will now turn to a brief discussion of its own concerns with potential jurisdictional and prudential problems that may arise when dealing with class action bars.

## VIII.  PRUDENTIAL CONSIDERATIONS DO NOT RENDER THE CLASS ACTION BAR UNENFORCEABLE

Having addressed the parties' arguments regarding enforceability and unconscionability of the class action bar, the Court will finally address its own concern with the bar, namely, whether such a clause improperly intrudes upon the Court's ability to manage its cases pursuant to the Federal Rules of Civil Procedure.  The Court notes that previous opinions addressing class action and/or class arbitration bars have not addressed the concept that a class action bar (or similar agreement by the parties) might impugn the Court's ability to properly regulate litigation before it.  Perhaps the Court is answering a question that need not be asked, but the Court feels that it needs

to provide some cautionary advice on the topic of waivers.  In addition to unconscionability concerns, with respect to the many different waiver provisions being inserted into contractual agreements, at some point parties are going to overstep their bounds and intrude into the province of the Court's by waiving procedural matters that affect case management and judicial economy.  *See Evergreen Nat'l Corp. v. Killian Constr. Co.*, 876 S.W.2d 633, 635 (Mo. Ct. App. 1994) (allowing party to waive objection to personal jurisdiction and permit variances in the method of service or notice but finding that "there is no authority for the proposition that parties may waive . . . other procedural matters which affect judicial economy rather than the parties' due process rights").

The fact that class actions are judicially created tools of litigation management caused this Court to give serious consideration to whether or not it should sanction the parties' agreement to deviate from the Federal Rules of Civil Procedure.  However, despite the fact that Rule 23 is, first and foremost, a tool intended to enhance economy and management, modern district courts cannot certify a class under Rule 23 on their own initiative without a request from one or both of the parties.  *See Newsom v. Norris*, 888 F.2d 371, 381-82 (6th Cir. 1989) ("Although a trial 'court may suggest that relief to a definable class would be appropriate, . . . it cannot convert an individual action into a class action on its own motion.'") (quoting 7B Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1785) (omission in original).  Indeed, unlike other Federal Rules, *e.g.,* Rules 13 and 19, there is nothing compulsory about bringing

a claim under Rule 23; thus, there is nothing jurisdictional about Rule 23.  This fact gives the Court some comfort that, by enforcing the class action bar at issue, the Court will not improperly alter other procedural mandates, as would be the case if, for example, the question before the Court was the enforceability of a contractual bar on compulsory counterclaims.  *See, e.g., Loader Leasing Corp. v. Kearns*, 83 F.R.D. 202, 203-04 (W.D. Penn. 1979) (declining to enforce waiver of compulsory counterclaim because to do so would "unreasonably restrict the privilege of litigating a claim and limit the jurisdiction of the district courts").  Further, the Court emphasizes that its enforcement of the class action bar in this case is limited to the facts and circumstances of this case.  The Court cautions parties that other contractual deviations from the Federal Rules of Civil Procedure may be unconscionable or stricken if they intrude on the Court's ability to manage litigation.

## CONCLUSION

Plaintiffs bear the burden of showing why the class action bar should not be enforced in this case.  For the above-described reasons, the Court concludes that Plaintiffs have not met their burden.  The facts of this case do not support a finding under Colorado law that the class action bar is unconscionable or otherwise unenforceable.

Accordingly, Plaintiffs' Motion for Class Certification (Doc. # 212) is DENIED.

IT IS FURTHER ORDERED that the hearing on the Motion currently scheduled for April 23-24 is VACATED.

DATED:  April 20, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge